COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

REGENT HEALTH CARE CENTER OF §
EL PASO, L.P., D/B/A REGENT CARE              No. 08-07-00321-CV
CENTER OF EL PASO, §

                                             Appeal from the
           Appellant, §

                                             34th District Court
v. §

                                             of El Paso County, Texas
MELBA WALLACE, INDIVIDUALLY, §
AND ON BEHALF OF THE ESTATE OF               (TC# 2006-1719)
SPURGEON WALLACE, §

           Appellee. §

## **O P I N I O N**

Regent Health Care Center appeals the denial of its motion to dismiss pursuant to section 74.351 of the Texas Medical Liability and Insurance Improvement Act.[1]  For the following reasons, we remand for proceedings consistent with this opinion.

### **I. BACKGROUND**

Spurgeon Wallace was an eighty-one-year-old man from Dell City, Texas.  He suffered a hemorrhagic stroke on November 10, 2004.  He was taken to the emergency room at Del Sol Medical Center (the "Medical Center" or the "acute care facility") in El Paso.  It was revealed that he had a hemorrhage and tumor in the left frontal portion of his brain, and he underwent a left frontal crainiotomy at the acute care section at Del Sol.

On November 17, 2004, Mr. Wallace was transferred to Del Sol's Rehabilitation Center (the "Rehabilitation Center").  While undergoing treatment there, he fell from his wheelchair and suffered

_____

[1] TEX. CIV. PRAC. & REM. CODE ANN. § 74.351.

a hip fracture. He underwent hip surgery at the acute care facility. Mr. Wallace was thereafter denied readmission to the Rehabilitation Center because of his inability to comply with treatment, due to his cognitive status.

On December 6, 2004, Mr. Wallace went from the acute care facility to the Regent Health Care Center. His pre-admission history included peripheral vascular disease (PVD), hypertension (HTN), and chronic obstructive pulmonary disease (COPD). He had a history of smoking for over 65 years, coronary artery disease (CAD) with a previous coronary artery bypass graft, congestive heart failure (CHF), dementia, hyperlakemia, kidney disease, and MRSA.

On January 9, 2005, Mr. Wallace was returned to the Medical Center, where he remained until he was weaned from a ventilator, pursuant to a "do not resusitate" request from his family. The death certificate indicated the cause of death as being Cardiomyopathy secondary to Atherosclerotic Heart Disease, COPD, Cerebral bleed, and debility.

On April 7, 2006, Melba Wallace filed suit against Regent, alleging that Regent caused Mr. Wallace to develop pressure ulcers, undergo surgical procedures, and die from cardiomyopathy secondary to atherosclerotic vascular disease, chronic obstructive pulmonary disease, cerebral bleed, and debility.

On July 20, 2006, Wallace served on Regent a section 74.351-expert report authored by Charles A. Cefalu, M.D., M.S. Wallace served the report of Judy N. Bair, R.N., B.S., on July 26, 2006. On August 7, 2006, Regent filed its objections to the adequacy of Wallace's reports on the grounds that: (1) the report of Dr. Cefalu is inadequate with regard to causation, (2) Nurse Bair is not qualified to opine regarding causation, and (3) neither report addresses certain of Wallace's allegations regarding violations of the Texas Health and Safety Code and the Texas Penal Code.

2

Wallace responded by acknowledging that a nurse could not opine about causation and Nurse Bair's report would only be used regarding the issue of the nursing standard of care and breach of the nursing standard of care. Furthermore, Wallace stated that she had abandoned any allegations based upon Texas Health and Safety Code or the Texas Penal Code. Wallace also stated that Regent's objections concerning the inadequacy of Dr. Cefalu's report regarding causation were vague, overbroad, and ambiguous, and the objections should be deemed as waived.

Regent filed a Motion to Dismiss with Prejudice and Request for Statutory Sanctions. After a hearing, the trial court denied the motion to dismiss.

## II. DISCUSSION

In Issue No. One, Regent asserts that the court abused its discretion by denying its Motion to Dismiss with Prejudice and Request for Statutory Sanctions, because Dr. Cefalu's report contains only conclusory statements regarding causation. Specifically, Regent contends that the expert report contains nothing more than conclusory statements that fail to link the alleged breaches to the injuries, harm, or damages alleged, and fails to explain how the alleged breaches caused the injuries, harm, or damages alleged.

We review the trial court's decision to deny a motion to dismiss for an abuse of discretion. *American Transitional Care Ctrs., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Palafox v. Silvey,* 247 S.W.3d 310, 314 (Tex. App.--El Paso 2007, no pet.); *Kendrick v. Garcia*, 171 S.W.3d 698, 702-03 (Tex. App.--Eastland 2005, pet. denied). A trial court abuses its discretion, if it acts without reference to any guiding rules or principles or acts in an arbitrary or unreasonable manner. *Palafox,* 247 S.W.3d at 314. An abuse of discretion does not occur merely because a trial judge decides a matter within his discretion differently from how the reviewing court would have decided

under similar circumstances. *Id.*

In a health care liability claim, a claimant must, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report, for each physician or health care provider against whom a liability claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).

If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to subsection (c), enter an order that:

(1)  awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2)  dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

If an expert report has not been timely served because elements of the report are deficient, the court may grant one thirty-day extension to the claimant in order to cure the deficiency. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c).

An expert report is defined as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).  A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the foregoing definition of an expert report. TEX. CIV.

4

PRAC. & REM. CODE ANN. § 74.351(*l*).

To constitute a good-faith effort, an expert report is required to provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Palacios*, 46 S.W.3d at 879). A report need not marshal all of the plaintiff's proof, but must include the expert's opinion on the standard of care, breach, and causal relationship. *Id.*

The medical liability statute does not require that a single expert address all liability and causation issues; rather the plaintiff may satisfy the requirements by serving reports of separate experts regarding different issues. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i). The report need not present all the plaintiff's proof; however, the expert may not merely state conclusions about the three elements that the Act identifies: standard of care, breach, and causal relationship. *Wright*, 79 S.W.3d at 52. An expert must explain the bases of his opinions and link his conclusions to the facts. *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999). In determining whether a report constitutes a good faith effort, the trial court should look no further than the report itself, since all the information relevant to the inquiry is contained within the four corners of the document. *Wright*, 79 S.W.3d at 52; *Palafox,* 247 S.W.3d at 314.

In his thirty-one page report, Dr. Cefalu sets out the nurses' notes chronologically and provides commentary regarding deficiencies in the care rendered by Regent's staff, including its nurses. The report discusses deficiencies in many areas, including the failure to prevent or adequately treat pressure ulcers, prevent falls, prevent weight loss, prevent infection, and failure to provide accurate and complete medical records.

Specifically, the areas of Dr. Cefalu's concern relative to Mr. Wallace, upon his admission to Regent on December 6, 2004, were altered skin integrity, altered nutritional status, hydration (fluid maintenance), reporting change of condition, and medical record documentation. The applicable standard of care for a resident in Mr. Wallace's condition was stated to be for the nursing staff to develop and implement relevant care plans, in order to provide the highest quality of care and prevent functional and cognitive decline. While care plans were developed that were voluminous and included a number of possible interventions, Dr. Cefalu indicated that these plans were not implemented in many cases. The plans that were developed were, in his opinion, grossly inadequate and were therefore difficult to implement and follow. Dr. Cefalu opined that, as a result, Mr. Wallace developed worsening pressure ulcers, malnutrition, and dehydration, and the staff also failed to develop and implement comprehensive care plans for altered nutritional status, hydration, and altered skin integrity. Accordingly, Dr. Cefalu concluded, Mr. Wallace's nutritional status worsened, he continued to suffer dehydration, his pressure ulcers worsened, and, as a result, his cognitive and physical functions declined.

In his report, Dr. Cefalu noted that Mr. Wallace had five pressure ulcerations when he was admitted to Regent. No turning records were found for the time of his admission and turning is not listed as an intervention. There is only one indication of turning every two hours for one day during the admission. No pressure relief devices were documented and waffle boots were documented as having been used once. At the end of his admission at Regent, the status of Mr. Wallace's pressure ulcers had worsened. They had increased in size and a sixth ulcer had developed. This breached the standard of care, in that residents having pressure sores must receive treatment and services to promote healing, prevent infection, and prevent new sores from developing. Dr Cefalu opined that

6

the standard of care to adequately assess the patient's risk for skin breakdown based on his functional status was breached by failing to turn Mr. Wallace every two hours, failing to provide good preventive skin care and prevent further decline in skin integrity or worsening of his pressure ulcerations. There was a failure to provide adequate pressure relief devices to the bed or heels. Further, the patient was inaccurately assessed as being at a moderate risk, rather than a high risk, since he was totally dependent with regard to his daily activities. As a result, Mr. Wallace developed worsening pressure ulcerations on his sacrum and buttock, right leg, and right heel. Dr. Cefalu stated that, with a reasonable medical probability, the nursing staff of Regent Care Center deviated from the applicable standard of care by failing to develop appropriate interventions such as turning every two hours, use of a pressure relieving device to the bed, heel, and elevation and waffle boots to the heels. This failure resulted in worsening pressure ulcers, as noted on his re-admission to the Medical Center.

Dr. Cefalu also opined that the medical records indicated that Mr. Wallace was at a high risk for falls. He had fallen at another care facility and had fractured his hip. The applicable standard of care for a resident such as Mr. Wallace, who was at a high risk for falls by virtue of his dementia and ADL (activities of daily living) dependency, is to develop and implement a comprehensive care plan for falls, including specific items such as bed and chair alarms to alert the nurses that the resident is trying to ambulate without assistance. Further, toileting every two hours was required to prevent the patient form ambulating without assistance or becoming wet. Dr. Cefalu stated that the staff did not develop or implement a comprehensive care plan to prevent falls or injury, notwithstanding the fact that they had noted him to be at a high risk for falls. As a result, Mr. Wallace was found on the floor on multiple occasions. Dr. Cefalu opined that, with a reasonable

7

medical probability, the nursing staff of Regent deviated from the applicable standard of care by failing to develop and implement and update a comprehensive and targeted care plan to prevent another fall with injury. These failures resulted in worsening physical function.

Dr. Cefalu stated in his report that malnutrition is associated with impaired wound healing, increased morbidity, reduced function, increased health care utilization, and altered immunity. Further, patients like Mr. Wallace are at risk for dehydration due to advanced age and dementia. The applicable standard of care required Regent to develop and implement a comprehensive care plan for altered nutritional status and hydration status. Nutritional parameters such as weight loss, cachexia, and malnourishment were indicated and should have been addressed. Mr. Wallace required complete assistance with eating, and he was on a mechanically-altered therapeutic diet. The care plan which was established indicated that the staff was to monitor Mr. Wallace's intake, output, weight, and access labs when available. However, the ADL meal record documentation conflicted with the nursing notes on all but one day during the admission. Also, the ADL sheets for the month of January were not found, and in December, no percentage intake was noted. Meal supplements were apparently not provided in January, although it was noted that they were provided in December.

Dr. Cefalu opined that, while a care plan was developed, Regent breached the standard of care by failing to adequately monitor the patient's nutritional status, failing to access nutritional and hydration laboratory parameters regularly during his admission, and failing to notify the attending physician of reduced meal or fluid intake in order that the administration of artificial means of feeding could be considered. The nursing records show extensive periods where no meal intake was recorded, and the required weekly weighing of Mr. Wallace was not performed. These breaches in care resulted in worsening malnutrition and dehydration, which caused the patient's pressure sores

8

to become worse, and his cognitive and functional status to deteriorate.

Dr. Cefalu stated in his report that the applicable standard of care for a resident in Mr. Wallace's condition required Regent to report acute changes of condition to the attending physician and family. The nursing notes for December 29 indicate that Mr. Wallace was found scooting around on the floor at 4 a.m. On December 31, the nursing notes indicate there was a 1-cm. opening to the incision site, although there was no sign of infection or bleeding. However, the nurses failed to follow up after observing the presence of infection on Mr. Wallace's hip on January 2. The hip was never assessed by a physician. No assessment occurred until the patient was admitted to the hospital on January 9, when it was found that he was infected with MSRA with undermining. Also, the nurses failed to report the laboratory result of a white blood cell count of 14,000 on January 6. Regent's failures to promptly notify the attending physician of the worsening status of the wound and the elevated white blood count contributed to the worsening of Mr. Wallace's pressure ulcers and his worsening physical and cognitive status.

Dr. Cefalu opined that the applicable standard of care for a patient such as Mr. Wallace required Regent to provide accurate and complete medical records. Regent breached this standard of care, because the medical records assessments conflicted with the patient's known health problems. The records indicated that Mr. Wallace was not reported to have had infections or falls in the last thirty days, notwithstanding the fact that he was admitted with an infection and a fracture to the right hip. He was reported to have had no weight loss in the past ninety days and no nutritional problems were noted, despite the fact that the records from his prior admission to the Del Sol facility indicated otherwise. Dr. Cefalu stated that Regent's failure to document daily food intake affected the ability to determine whether Mr. Wallace was properly nourished and hydrated.

9

Dr. Cefalu opined that this failure contributed to his worsening malnutrition and dehydration, which in turn caused the patient's pressure sores to become worse and his cognitive and functional status to deteriorate.

Dr. Cefalu's concluding opinion was that:

> Mr. Spurgeon Wallace entered Del Sol Medical Center ambulatory with a significant history of Coronary Artery Disease and Chronic Lung Disease. Though the Death Certificate noted above lists other causes of death, it is my expert opinion that the deviations of the standard of care by the staff of the acute care unit of the Del Sol Medical Center and the Rehabilitation Center and Regent Care Center relative to the failures to provide ongoing monitoring of skin integrity resulting in either pressure ulcerations or their worsening, Malnutrition or its worsening, Dehydration or its worsening and subsequent cognitive and physical decline caused his premature death. This is in part due to the close proximity of the failures and his death.

As stated, the expert may not merely state conclusions about the three elements that the Act identifies: standard of care, breach, and causal relationship. *Wright*, 79 S.W.3d at 52. As is true in other types of negligence cases, causation is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.--San Antonio 2004, no pet.). Mere reference to general concepts regarding assessment, monitoring, and interventions are insufficient as a matter of law. *See Palacios*, 46 S.W.3d at 873. There cannot be an analytical gap between the breach of care and the ultimate harm. *Clark v. HCA, Inc.*, 210 S.W.3d 1, 11 (Tex. App.--El Paso 2005, no pet.).

In the present case, while the report indicates that the breach of the standard of care resulted in worsening of the described skin conditions, there is no linkage to the cause of death, aside from the assertion of a close temporal proximity between the conditions and the premature death. Furthermore, there is no causal connection with regard to the falls that occurred and any harm that

10

resulted to the patient. We find that this is inadequate to demonstrate causation. Issue No. One is sustained.

Given the foregoing discussion, we find it unnecessary to discuss Appellant's remaining issues, aside from the disposition of the case. Regent maintains that the cause should be dismissed with prejudice, with an award of attorney's fees. Wallace asserts that in the event the report is inadequate, the case should be remanded to the trial court for a thirty-day extension. Under section 74.351(c), the trial court *may* grant a thirty-day extension to the claimant to cure any deficiency in a timely-served expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); *see also Thoyakulathu v. Brennan*, 192 S.W.3d 849, 853 (Tex. App.--Texarkana 2006, no pet.).

The term "may," as used in subsection (c), vests the trial court with discretion to grant a thirty-day extension. *See In re Covenant Health Sys.*, 223 S.W.3d 423, 426 (Tex. App.--Amarillo 2006, orig. proceeding); *see also* TEX. GOV'T CODE ANN. § 311.016(1) ("may" creates discretionary authority or grants permission or a power); *Hardy v. Marsh*, 170 S.W.3d 865, 870-71 (Tex. App.--Texarkana 2005, no pet.) (use of the word "may" in a statute shows that the provision is discretionary and not mandatory).

### III. CONCLUSION

We remand the cause to the trial court for a determination whether a thirty-day extension should be granted. We assume that the trial court will notify the parties whether it intends to grant such an extension within approximately thirty days following its receipt of this opinion.

KENNETH R. CARR, Justice

November 25, 2008

Before Chew, C.J., McClure, and Carr, JJ.

11