COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| SCOTT A. PROTZMAN, M.D., EL PASO ORTHOPAEDIC SURGERY GROUP, P.A., AND FRED UTTER, CRNA, | § § | No. 08-15-00281-CV |
| Appellants, | § | Appeal from the |
| v. | § | 448th District Court |
| MARIA T. GURROLA, INDIVIDUALLY AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES, AND AS REPRESENTATIVE OF THE ESTATE OF OSCAR GURROLA, DECEASED, | § § § | of El Paso County, Texas (TC# 2014-DCV-3560) |
| Appellee. | § | |

## **O P I N I O N**

This is a health care liability case subject to the Texas Medical Liability Act. TEX.CIV.PRAC.&REM.CODE CH. 74 (West 2011). On November 9, 2012, Mr. Oscar Gurrola underwent a non-surgical manipulation of his shoulder which was performed under anesthesia at El Paso Specialty Hospital, was discharged, suffered cardiac arrest, and died. His wife, Maria Gurrola, sued El Paso Specialty Hospital, Dr. Scott A. Protzman, El Paso Orthopaedic Surgery Group (EPOSG), and Nurse Anesthetist Fred Utter, CRNA.[1] Maria timely served Dr. Michael

---

[1] El Paso Specialty Hospital challenges the trial court's ruling on the expert report as to the hospital in a separate

Koumjian's expert reports on the defendants. The trial court heard the defendants' objections to the expert reports and denied their motion to dismiss Maria's suit. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(b)(West Supp. 2015).

In this interlocutory appeal, Appellants ask us to determine whether the trial court abused its discretion when it overruled their objections and denied their motion to dismiss. TEX.CIV.PRAC.&REM.CODE ANN. § 51.014(a)(9)(West Supp. 2015). Appellants assert the expert reports were inadequate because: (1) Dr. Michael Koumjian failed to establish his qualifications to opine on the standard of care, breach of that standard, and causation in support of Maria's health care liability claims relating to the death of her husband, Oscar; and (2) the expert reports fail to satisfy the TMLA requirements regarding causation based on the conduct of Dr. Scott A. Protzman and Nurse Utter, and as to the standard of care and breach of that standard in relation to the conduct of Nurse Utter. TEX.CIV.PRAC.&REM.CODE ANN. § 51.014(a)(10).

We conclude the trial court did not abuse its discretion in denying the defendants' objections and motion to dismiss Dr. Koumjian's expert report regarding Dr. Protzman's conduct, and affirm the trial court's ruling. However, Dr. Koumjian's expert report regarding Nurse Utter is inadequate to constitute an objective good faith effort to comply with TMLA's statutory requirements. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(*l*)(West Supp. 2015). We affirm in part, reverse in part, and remand the case for further proceedings. TEX.R.APP.P. 43.2(a), (d).

## BACKGROUND

The basis of Maria's claim and the focus of Dr. Koumjian's report involves Oscar's post-procedure tachycardia as well as the acts or omissions of the Hospital's employees or agents

---

appeal. *See El Paso Specialty Hospital, LTD v. Maria Gurrola, Individually and on Behalf of all Wrongful Death Beneficiaries and as Representative of the Estate of Oscar Gurrola, Deceased,* No. 08-15-00282-CV.

in relation thereto, specifically with regard to the failure to monitor, diagnose, care for and treat the condition. Maria alleges that while Oscar was under the care of the defendants, he developed symptoms of congestive heart failure but was discharged home where he suffered a cardiac arrest, was cared for by emergency personnel, and transported to another medical facility where he was pronounced dead. An autopsy revealed that Oscar died from severe coronary atherosclerosis.

## DISCUSSION
### *Standard of Review*

We review the trial court's ruling to determine whether it abused its discretion in ruling on the adequacy of the expert report. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex. 2001); *Tenet Hospitals Ltd. v. Boada*, 304 S.W.3d 528, 533 (Tex.App.--El Paso 2009, pet. denied). Under an abuse of discretion standard, the appellate court defers to the trial court's factual determinations if they are supported by evidence, but reviews the trial court's legal determinations de novo. *See Stockton v. Offenbach,* 336 S.W.3d 610, 615 (Tex. 2011)(citing *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 643 (Tex. 2009)). A trial court abuses its discretion if it rules without reference to guiding rules or principles. *Samlowski v. Wooten,* 332 S.W.3d 404, 410 (Tex. 2011).

### I. Expert Qualifications

Appellants present their complaints in four issues. In Issues One and Two respectively, Appellants challenge Dr. Koumjian's qualifications to render expert opinions on the standards of care and breach of applicable standards, and his qualifications to opine regarding the causal nexus between the alleged negligence and Oscar's death. We first address Issue Two.

To opine on whether a physician departed from accepted standards of medical care for physicians, an expert must be a physician who:

3

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(a)(West 2011); TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(A). To opine on whether a health care provider other than a physician departed from accepted standards of health care, an expert must be a person who:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(b); TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(A). To opine on causation in any healthcare liability claim, an expert must be a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(C).

An expert report or its required accompanying *curriculum vitae* must show that the expert is qualified to opine on the subject matter at issue. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a); *In re McAllen Med. Center, Inc.*, 275 S.W.3d 458, 463 (Tex. 2008). The medical expert need not practice in the same specialty as the defendant in order to qualify as an expert. *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003). However, not every licensed physician is always

4

qualified to testify on every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996).

To determine whether an expert report is sufficient to demonstrate the qualifications of the expert to opine, the trial court should focus on the medical expert's "knowledge, skill, experience, training, or education" concerning the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.2d at 153-54 (applying Texas Rule of Evidence 702); *see also Tenet Hospitals, Ltd. v. Garcia*, 462 S.W.3d 299, 306 (Tex.App.--El Paso 2015, no pet.)(application of rules of evidence in assessing expert's qualifications to opine on causation as set forth in Section 74.351(r)(5)(C) pertains only to expert's qualifications and does not extend to expert's opinion). The focus of the trial court should not be on the specialty of the medical expert. *Roberts*, 111 S.W.3d at 122. A medical expert from one specialty may be qualified to testify if he has practical knowledge of what is traditionally done by medical experts of a different specialty under circumstances similar to those at issue in the case. *Pediatrix Med. Services Inc. v. De La O*, 368 S.W.3d 34, 40 (Tex.App.--El Paso 2012, no pet.). If the subject matter is common to and equally recognized and developed in all fields of practice, any practitioner familiar with the subject may testify as to the standard of care. *Id*. at 40. The trial court must ascertain that the expert does indeed possess the expertise on the subject for which he is giving an expert opinion. *Palafox v. Silvey*, 247 S.W.3d 310, 316 (Tex.App.--El Paso 2007, no pet.). The proffered medical expert's qualifications must be evident from the four corners of his expert report and *curriculum vitae*. *See Palacios*, 46 S.W.3d at 878. We cannot infer causation either by filling in missing gaps or by guessing what an expert likely meant or intended. *Tenet Hosps. Ltd. v. Bernal*, 482 S.W.3d 165, 171 (Tex.App.--El Paso 2015, no pet.); *Tenet Hosps, Ltd.*

5

*v. Garcia,* 462 S.W.3d 299, 310 (Tex.App.--El Paso 2015, no pet.)(citing *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002)).

The basis of Maria's claim and the focus of Dr. Koumjian's report involves Oscar's post-procedure tachycardia as well as the acts or omissions of Dr. Protzman and Nurse Utter in relation thereto, specifically with regard to the failure to diagnose, care for and treat the condition. Maria alleges that while Oscar was under the care of the defendants, he developed symptoms of congestive heart failure but was discharged home where he suffered a cardiac arrest, was transported to another medical facility, and was pronounced dead. An autopsy revealed that Oscar had died from severe coronary atherosclerosis.

### 1. Qualifications to Opine on Standards of Care and Breach

In Issue Two, Appellants complain Dr. Koumjian is not qualified to render expert opinions regarding the standard of care or the breach of that standard by Dr. Protzman or Nurse Utter. As to Protzman, Appellants contend that Dr. Koumjian has failed to demonstrate "how or why" he is familiar with the standard of care, and assert that his failure to specify standards for post-procedure care renders his report too ambiguous, vague, and overbroad to render him qualified to opine as to the standards applicable to Dr. Protzman or Nurse Utter. They also complain that Dr. Koumjian fails to explain how or why Dr. Protzman should have been aware of the severe nature of Oscar's cardiovascular disease or should have acted differently.

Appellants argue that Dr. Koumjian has not shown that he is qualified to opine on the standard of care and breach of the standard that is applicable to Nurse Utter because he fails to show that he is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by Nurse Utter, providing anesthesia, or was practicing that type of

6

health care at the time Maria's claim arose, or has knowledge of the accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.

We disagree with these assertions. In her petition, Maria asserts that: (1) Appellants knew or should have known that Oscar was at risk for "developing a cardiac arrest because of severe coronary disease;" (2) while Oscar was at the hospital, the standard of care included proper assessment and treatment to prevent a patient like Oscar from "developing a cardiac arrest because of severs coronary artery disease;" (3) Appellants violated the standard of care by failing to provide proper assessment and treatment to prevent Oscar's cardiac arrest and death; and (4) at all relevant times, the Hospital and EPOSG acted by and through its employees and agents and are vicariously liable for their negligent acts and omissions.[2] There is no question that Maria's complaint addresses Oscar's status as an at-risk cardiac patient, and challenges the Hospital's compliance with the proper standard of care to be provided him as an at-risk cardiac patient. Therefore, pursuant to Section 74.351(r)(5)(B), Dr. Koumjian must establish that he is qualified under the requirements of Sections 74.401 and 74.402 to testify as an expert witness on the issue of whether the physician and defendant health care provider departed from those applicable accepted standards of care. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(B); TEX.CIV.PRAC.& REM.CODE ANN. §§ 74.401, 74.402.

---

[2] We analyze the sufficiency of the expert report only with respect to the actions of EPOSG's employees and agents in Maria's vicarious liability claim. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 626 (Tex. 2013)(defendant did not challenge adequacy of expert report as to its vicarious liability); *TTHR Ltd. Partnership v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013)(expert report is analyzed as to physician's actions, and plaintiff's claims that hospital was vicariously liable for the physician's actions may proceed if expert report regarding physician's actions adequately address the standard of care, breach, and causation as to physician); *see also Tenet Hosp. Ltd. v. Bernal*, 482 S.W.3d 165, 174 (Tex.App.--El Paso 2015, no pet.)(expert must consider both the pleadings and the medical record in formulating opinion, but is not required to address hospital's vicarious liability for physician's acts or omissions in order for expert's report to be adequate)(citing *Loaisiga v. Cerda,* 379 S.W.3d 248, 261 (Tex. 2012)).

*Applicable Law*

In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(a). For the purpose of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians. TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(b). In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim. TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(c)(1), (2). The court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care, but may depart from those criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony. TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(d).

8

In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition *involved in the claim*; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.   [Emphasis added].

TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(b).   "Practicing health care" includes:   (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider. TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(a).

In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:   (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim.   TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(c).   In determining whether an expert is qualified to offer expert testimony on the issue of whether the defendant health care provider departed from accepted standards of medical care, the court shall

9

apply the criteria specified in Subsections (a), (b), and (c) but may depart from those criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony. TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(d). If it departs from the specified criteria, the court shall state on the record its reason for admitting the testimony. *Id.*

*Analysis*

Maria filed Dr. Koumjian's expert reports regarding Dr. Protzman and Nurse Utter on March 23, 2015, and April 6, 2015, respectively. In each, Dr. Koumjian's *curriculum vitae* indicates that he has been licensed to practice medicine since 1978, is currently the Chief of Surgery at Sharp Grossmont Hospital, has appointments as attending staff, consulting staff, provisional staff, or transitional staff in cardiothoracic surgery at seven hospital facilities, is board certified in Thoracic Surgery, and also conducts a private practice in cardiovascular and thoracic surgery. Thus, he was licensed and practicing medicine as a cardiovascular and thoracic surgeon and as Chief of Surgery at the time of his expert report and at the time Maria's claim arose. He has previously served as Chief of the Cardio-Thoracic Section of Scripps Mercy Hospital, and has served as a District Counselor for the American College of Cardiologists. Dr. Koumjian has completed residencies in general surgery and cardiothoracic surgery, as well as fellowships involving cardiac surgery, cardiac transplantation, and cardiac "valve." He has lectured on the intra-operative use of inotropic agents during and immediately post-cardiopulmonary bypass, and has served as an assistant clinical professor of surgery for the University of California at San Diego's Department of Cardiac Surgery.

In his expert reports, Dr. Koumjian states that his medical practice involves the diagnosis and treatment of coronary artery disease under the same or similar circumstances here, and that he

is familiar with the standard of care concerning the evaluation of both the risk and prevention of death caused by severe coronary atherosclerosis under the same or similar circumstances in this case. He is familiar with the evaluation, consultation, diagnosis, and treatment of patients who are at risk for death caused by atherosclerosis, and notes that the standard of care for identifying the risks and symptoms of severe coronary artery disease and obtaining cardiology consultation under the same or similar circumstances in this case applies to all physicians, including orthopaedic surgeons, and to nurse anesthetists. Dr. Koumjian works closely with nurses who evaluate patients who are at risk and have symptoms associated with severe coronary artery disease under the same or similar circumstances in this instance, and is familiar with the nursing standard of care for reporting to physicians the symptoms associated with coronary artery disease, the diagnosis, care, or treatment of which is involved in Maria's claim.

In his expert report, Dr. Koumjian notes that a cardiologist had determined ten days before Oscar's shoulder-manipulation procedure that although surgery was not contraindicated, Oscar would need to be closely monitored due to his history of coronary artery disease. Oscar was at risk of death due to severe coronary artery disease, and Dr. Koumjian states that Appellants knew or should have known this as Oscar had a diagnosis of atherosclerotic disease, coronary artery stents, uncontrolled diabetes, and hypertension, which are factors for tachycardia. Without prompt diagnosis and treatment, tachycardia can lead to cardiac arrest. Dr. Koumjian claims Appellants failed to properly diagnose and treat the signs and symptoms which Oscar presented post-procedure. These symptoms included elevated blood pressure, elevated heart rate, pain, and dizziness. He asserts that the applicable standard of care required the performance of a "STAT cardiac workup." This workup would have shown Oscar's tachycardia and would have required

11

immediate treatment such as defibrillation, intubation, and mechanical ventilation. These treatments, more likely than not, would have prevented Oscar's cardiac arrest and death.

According to Dr. Koumjian, in addition to the standard of care applicable to both physicians and healthcare providers, the standard of care further required that Dr. Protzman as a physician both closely monitor Oscar because of his high risk for cardiac arrest due to coronary artery disease, and provide orders to staff to carefully monitor Oscar for any signs or symptoms related to heart failure, such as a significant change in blood pressure, tachycardia, or dizziness, and to notify him immediately if they occurred. Instead, Dr. Protzman failed to closely monitor Oscar, and failed to provide orders to staff to carefully monitor Oscar for signs or symptoms of heart failure such as changes in blood pressure, tachycardia, or dizziness. This breach of the standard resulted in a failure to diagnose and treat Oscar's ventricular tachycardia before he was discharged from El Paso Specialty Hospital. Oscar experienced a significant change of blood pressure, tachycardia, and dizziness while at the hospital but was sent home where he died that same day. According to Dr. Koumjian, had the standard of care been followed, the hospital's nursing staff would have notified Dr. Protzman or a physician, Oscar more likely than not would have been diagnosed with tachycardia and treated, and with such diagnosis and treatment, Oscar's ventricular tachycardia would have resolved and his cardiac arrest and death would have been prevented.

We do not find Dr. Koumjian's recitations regarding his experience, training, knowledge, or familiarity with the diagnosis, care, or treatment of the condition, injury, or harm in this case to be vague, overbroad, or permitting of impermissible inferences as Appellants suggest. Dr. Koumjian's qualifications to opine on the standards of care and breach of those standards

12

regarding Maria's claims in this case are evident from the four corners of his expert report and *curriculum vitae*. *See Palacios*, 46 S.W.3d at 878. Consequently, we conclude the trial court did not abuse its discretion in concluding that Dr. Koumjian is qualified to opine on the standard of care and breach thereof as it applies to Dr. Protzman as a physician and to Nurse Utter as a health care provider. Issue Two is overruled.

## 2. Qualifications to Opine on Causation

In Issue One, Appellants argue Dr. Koumjian has failed to explain his qualifications and has therefore not demonstrated that he is qualified to render an expert opinion on causation. They label as insufficient Dr. Koumjian's assertion that his practice of medicine "involves the diagnosis and treatment of coronary artery disease, under the same or similar circumstances as in this case." They specifically complain that Dr. Koumjian provides no insight regarding how his practice involves matters confronted by either Dr. Protzman or Nurse Utter, fails to address whether he treats patients like Oscar or is familiar with the issues presented in Maria's claim, and fails to assert that he is familiar with the consequences of the purported breaches of the standards of care. Although acknowledging that Dr. Koumjian may be qualified to opine on causation, Appellants assert his expert reports contain insufficient information, such as an explanation of his familiarity with the non-surgical interventions that he claims were required and could have prevented Oscar's death.

To opine on causation in any healthcare liability claim, an expert must be a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(C); TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(a). Rule of Evidence 702 provides that a witness who is qualified as an expert by

13

knowledge, skill, experience, training, or education may testify in the form of an opinion if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact issue. *See* TEX.R.EVID. 702. Section 74.351(r)(5)(C) incorporates the rules of evidence in the context of the expert's qualifications, not the substance of the opinion itself. *Garcia*, 462 S.W.3d at 306. Consequently, Rule 702's requirement that the witness must be qualified by "knowledge, skill, experience, training, or education" applies here. *Id.*

That an expert is qualified to opine on the subject matter at issue may be shown in the expert's report or its required accompanying *curriculum vitae*. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a); *In re McAllen Med. Center*, 275 S.W.3d at 463. We have examined Dr. Koumjian's report and *curriculum vitae*, and find that he has adequately shown that he is qualified by knowledge, skill, experience, training, or education to opine on causation on the matter at issue.

To the extent we have addressed Dr. Koumjian's qualifications by knowledge, skill, experience, training, or education as presented within the four corners of his expert reports, we need not repeat them here. However, in addition to stating that his "practice of medicine involves the diagnosis and treatment of coronary artery disease, under the same or similar circumstances as in this case," Dr. Koumjian also notes his familiarity with the standard of care for the prevention of death under the same or similar circumstances as those of Oscar.

Dr. Koumjian's qualifications to opine on the standards of care, breach of those standards, and causation arising from such breach with regard to the claims in this case are evident within the four corners of his expert report and *curriculum vitae*. *See Palacios*, 46 S.W.3d at 878. Consequently, because Dr. Koumjian's expert report shows that he is a physician having

14

knowledge and experience concerning the subject of his opinion, we conclude the trial court did not abuse its discretion in determining that Dr. Koumjian was qualified to offer an opinion on the cause of Oscar's cardiac arrest and death. Issue One is overruled.

## II. Sufficiency of Expert Reports

In Issues Three and Four respectively, Appellants complain the trial court abused its discretion in overruling their objections to the adequacy of Dr. Koumjian's expert reports and in failing to dismiss Maria's suit. Issue Three complains that Dr. Koumjian's expert report fails to provide a non-conclusory, factually-supported explanation of the causal link between Dr. Protzman and Nurse Utter's alleged negligence and Oscar's death. Issue Four asserts that Dr. Koumjian's expert report fails to establish the standard of care applicable to Nurse Utter, and Nurse Utter's breach of that standard of care.

*Applicable Law*

A plaintiff asserting a health care liability claim must serve each defendant with an expert report that includes "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damage claimed." TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(6); *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 141 (Tex. 2015); *Bustillos v. Rowley*, 225 S.W.3d 122, 130 (Tex.App.--El Paso 2005, pet. denied)(expert report need not include full statement of applicable standard of care and how it was breached; fair summary must set out what care was expected, but not given)(citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 880 (Tex. 2001)). A challenge to the sufficiency of a report must be sustained if the report does not represent an objective good

15

faith effort to comply with the statutory requirements. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(*l*); *Van Ness*, 461 S.W.3d at 141. A report is a good faith effort if it provides adequate information to inform the defendant of the specific conduct the plaintiff has called into question, provides a basis for the trial court to conclude that the claims have merit, and does not contain a material deficiency. *Van Ness*, 461 S.W.3d at 141-42.

The evidence in the expert report need not be the same evidence as if the merits of the claim are being litigated. *Palacios,* 46 S.W.3d at 879; *Tenet Hosps. Ltd. v. Barajas*, 451 S.W.3d 535, 540 (Tex.App.--El Paso 2014, no pet.). Rather, the expert's report can be informal and the information contained therein "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879; *Barajas*, 451 S.W.3d at 540. However, an expert must explain, based on facts set out in the report, how and why the breach caused the injury. *Van Ness*, 461 S.W.3d at 142, *citing Jelinek v. Casas,* 328 S.W.3d 526, 539-40 (Tex. 2010). A bare expert opinion that the breach caused the injury will not suffice. *Van Ness*, 461 S.W.3d at 142.

*Analysis*

Dr. Koumjian set out the following facts in his report as those on which he based his opinions. Oscar's cardiologist, Dr. Gregorio J. Castillo, examined him on October 29, 2012. Dr. Castillo noted that Oscar was scheduled for surgery the following week, that his blood sugars were elevated after increasing the dose of medication, that his blood pressure was 110/70, and his pulse was 63. Although Oscar had no symptoms of dizziness or syncope, Dr. Castillo observed that Oscar had uncontrolled diabetes and atherosclerotic cardiovascular disease. He noted that Oscar did not have a medical contraindication for surgery under general anesthesia for treatment of

16

his right shoulder adhesive capsulitis, but indicated that Oscar would require close monitoring because of his history of coronary artery disease.

On November 9, 2012, Oscar went to El Paso Specialty Hospital for a right shoulder therapeutic manipulation under general anesthesia and an injection of anesthetic, steroid, and arthrogram. Dr. Scott Protzman, an orthopaedic surgeon, and Nurse Anesthetist Fred Utter performed the orthopaedic procedure. Oscar's pre-anesthesia blood pressure was 128/90, and his heart rate was 84. The anesthesia was started at 9:05 a.m., and the procedure was commenced at 9:21 a.m. The procedure ended at 9:30 a.m., and Oscar was in the recovery room at 9:42 a.m. At that time, his heart rate was 82, and his respirations were 18. Anesthesia was ended eight minutes later at 9:50 a.m.

In the recovery room, Oscar complained of increasing pain. He subsequently underwent a block for post-operative pain, with anesthesia commending at 11:20 a.m. and ending at 11:45 a.m. Dr. Koumjian's expert report does not identify the person who administered this anesthesia to Oscar. In the recovery room, Oscar's blood pressure was 163/91, and his heart rate had increased to 91. Oscar told the recovery room nurse that he was feeling dizzy and very sleepy. The nurse informed Oscar that his symptoms were normal, and noted to Oscar and Maria that although Oscar's blood pressure was high, that was normal as well. The unidentified recovery room nurse did not notify a physician about Oscar's reported symptoms, and at approximately 12:50 p.m., "the nurse" instructed Oscar and Maria to return home.

As instructed, Oscar and Maria returned home. Maria assisted Oscar out of their car and into their home, and at approximately 2 p.m., Maria left to run errands. When Maria returned home, she found Oscar unresponsive and called 9-1-1. Emergency medical services arrived at

17

4:30 p.m., initiated cardio-pulmonary resuscitation on Oscar, and transported him to a hospital, arriving there at 4:47 p.m. Cardio-pulmonary resuscitation was discontinued at 4:59 p.m., and Oscar was pronounced dead. An autopsy report shows Oscar died from severe coronary atherosclerosis, and the certificate of death identifies Oscar's immediate cause of death was severe coronary artery disease.

## B. Expert Reports on Causation

In Issue Three, Appellants complain that Dr. Koumjian fails to provide a factual underpinning for his causation conclusions, and fails to explain how or why Oscar's ventricular tachycardia led to his fatal cardiac arrest, fails to discuss any connection between the ventricular tachycardia and the severe coronary atherosclerosis found after autopsy, or how immediate treatment consisting of defibrillation, intubation, and mechanical ventilation would have prevented the fatal cardiac arrest "hours later."

In his five-page expert reports, Dr. Koumjian notes that Oscar's post-procedure heart rate, elevated blood pressure, and dizziness are signs and symptoms of ventricular tachycardia. He states that untreated ventricular tachycardia can lead to cardiac arrest. There is no evidence noted in the expert report that the recovery room nurse or any nurse ever notified Dr. Protzman or any physician about Oscar's tachycardia signs and symptoms. Rather, the recovery nurse informed Oscar and Maria that Oscar's symptoms were normal and instructed them to return home.

Dr. Koumjian explains that Dr. Protzman breached the standard of care by failing to closely monitor Oscar, by failing to provide orders that staff carefully monitor Oscar for any signs and symptoms of heart failure such as a significant change in blood pressure, tachycardia, or dizziness, and to notify him or a doctor of such signs and symptoms. This breach of the standard

18

of care resulted in the failure to diagnose and treat Oscar's ventricular tachycardia before he was discharged and sent home. Oscar experienced a significant change of blood pressure, tachycardia, and dizziness post-procedure while at the hospital. Had the standard of care been followed, the hospital's nursing staff would have notified Dr. Protzman or a physician, and Oscar more likely than not would have been diagnosed with ventricular tachycardia and immediately treated with defibrillation, intubation, and mechanical ventilation. More likely than not, this diagnosis and treatment would have prevented Oscar's cardiac arrest and death.

In his report regarding Nurse Utter, Dr. Koumjian explains that Nurse Utter breached the standard of care by failing to carefully monitor Oscar for any signs and symptoms of heart failure such as a significant change in blood pressure, tachycardia, and dizziness. He opines that had Nurse Utter followed the standard of care, he would have assessed Oscar, found that Oscar had a significant change of blood pressure, tachycardia, and dizziness, and would have reported these findings to a physician. According to Dr. Koumjian, Nurse Utter's breach of the standard of care resulted in a failure to diagnose and treat Oscar's ventricular tachycardia before he was discharged and sent home. If Nurse Utter had followed the standard of care, more likely than not, Oscar would have been treated for tachycardia by defibrillation, intubation, and mechanical ventilation. This diagnosis and treatment, based on a reasonable medical probability, more likely than not would have resolved Oscar's ventricular tachycardia and prevented his cardiac arrest and death.

Dr. Koumjian's expert reports demonstrate that Dr. Protzman's and Nurse Utter's alleged negligence are causally related to Oscar's death. He reports that the signs and symptoms of Oscar's ventricular tachycardia were evident, detectable, and treatable, and that adherence to the standard of care by providing proper monitoring and administration of treatment more likely than

19

not would have resolved the tachycardia and prevented Oscar's cardiac arrest and death. It was incumbent upon the trial court to review the reports, sort out their contents, resolve inconsistencies, and decide whether the expert reports demonstrated a good faith effort to show that Maria's claims have merit. *See Van Ness*, 461 S.W.3d at 144. Based on our review, the reports provide a fair summary of Dr. Koumjian's opinions as to the causal relationship between Dr. Protzman's and Nurse Utter's alleged breaches and the harm claimed, inform the defendants of the conduct being called into question, and provide a basis for the trial court to conclude that Maria's claims have merit. Consequently, we conclude the trial court did not abuse its discretion by determining that the expert reports are not conclusory and constitute a good-faith effort to comply with the TMLA's requirements as to causation. Issue Three is overruled.

### 1. Expert Report on Nurse Utter's Standard of Care and Breach.

In Issue Four, Appellants complain the trial court abused its discretion by overruling their objections to the expert report regarding Nurse Utter on the basis that Dr. Koumjian's report fails to establish the standard of care applicable to Nurse Utter and his alleged breach of that standard. According to Dr. Koumjian's expert report, the standard of care for a nurse anesthetist, like that of Dr. Protzman, required that Nurse Utter monitor Oscar for signs and symptoms associated with heart failure and ventricular tachycardia, "such as a significant change in blood pressure, tachycardia, and dizziness," and report them to a physician, and alleges that Nurse Utter breached the standard of care by failing to do so.

Appellants counter that Dr. Koumjian's report as to Nurse Utter is deficient in part because it fails to place Nurse Utter in the recovery room with Oscar or explain the role of a nurse anesthetist in providing post-procedure care. They contend the report is also deficient because it

20

fails to identify or discuss Utter's role in relation to that of the hospital's nursing staff present in the recovery room with Oscar, or the hospital nursing staff to whom Dr. Protzman should have issued orders to closely monitor Oscar.[3]  Appellants note that Nurse Utter cannot be assumed to have provided post-operative care to Oscar, and indicate that Dr. Koumjian's report only links Nurse Utter to Oscar during the administration of anesthesia between 9:05 and 9:50 a.m., during which the report fails to claim that Oscar presented any observable symptoms of severe coronary artery disease such as elevated blood pressure, heart rate, and dizziness.  Those symptoms, Appellants' argue, presented only after a second administration of anesthesia by an unnamed provider.  For these reasons, Appellants argue Dr. Koumjian's expert report regarding Nurse Utter is speculative and without foundation as no facts recited in the report connect Nurse Utter's care to Oscar's post-procedure care.

We agree with these assertions.  The facts recited in Dr. Koumjian's expert report regarding Nurse Utter do not adequately explain how or why Nurse Utter's specific conduct constitutes a breach of the standard of care for a nurse anesthetist.  In his report, Dr. Koumjian specifically identifies Nurse Utter as the person who provided general anesthesia to Oscar between 9:05 and 9:50 a.m.  Oscar's pre-anesthesia heart rate was 84, and when he was taken to the recovery room at 9:42 a.m., eight minutes before anesthesia concluded at 9:50 a.m., his heart rate was 82.  However, the report does not identify Nurse Utter as the person who subsequently administered the anesthesia to Oscar for a pain-control block, nor as a member of the nursing staff of the hospital or its recovery room.  The facts which Dr. Koumjian recites regarding Oscar's post-procedure complaints, signs, and symptoms, neither directly nor indirectly implicate any act

---

[3]  Maria does not claim that Nurse Utter is an employee of the hospital.

21

or omission by Nurse Utter which indicates that he breached the standard of care for a nurse anesthetist in this situation.

The trial court's factual determination of Nurse Utter's alleged breach is not supported by the facts recited in Dr. Koumjian's expert report. *See Stockton,* 336 S.W.3d at 615. Because Dr. Koumjian's expert report does not provide adequate information to inform Nurse Utter of the specific conduct Maria has called into question, it fails to provide a basis for the trial court to conclude that Maria's claims against Nurse Utter have merit, and does not constitute an objective good faith effort to comply with the statutory requirements of an expert report. *See Van Ness*, 461 S.W.3d at 141-42. We conclude the trial court abused its discretion when it overruled Appellants' objections to Dr. Koumjian's expert report regarding Nurse Utter's alleged breach of the standard of care. Issue Four is sustained.

The Supreme Court has determined that when an appellate court reverses a trial court's denial of a motion to dismiss a health care liability claim due to omission of any of the statutory expert report requirements, the appellate court may remand the case to the trial court to consider granting a thirty-day extension to cure the deficiencies in the report. *Leland v. Brandal,* 257 S.W.3d 204, 207–08 (Tex. 2008); *see also Lewis v. Funderburk,* 253 S.W.3d 204, 208 (Tex. 2008)(stating that a deficient report may be cured by amending the report or by serving a new report from a separate expert that cures the deficiencies in the previously filed report); *Regent Health Care Center of El Paso, L.P. v. Wallace,* 271 S.W.3d 434, 441 (Tex.App.--El Paso 2008, no pet.). The trial court is in the best position to decide whether a cure for an inadequate expert report is feasible. *See Samlowski v. Wooten,* 332 S.W.3d 404, 411–12 (Tex. 2011). Based on these decisions, it is appropriate to remand the case to the trial court for consideration of whether

22

the deficiencies in the expert reports can be cured, and therefore, whether to grant an extension of time.

## CONCLUSION

The trial court's order is affirmed in part, and reversed and remanded in part to the trial court for further proceedings.


August 24, 2016

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.