

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00373-CV

_____

CAREFLITE AND NATHAN TATON, Appellants

V.

JEROLD TAYLOR, Appellee

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-296553-17

Before Sudderth, C.J.; Gabriel and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. Introduction

Appellants, Careflite and Nathan Taton, bring this interlocutory appeal from the trial court's order denying their motion to dismiss the claim Appellee Jerold Taylor has asserted against them. In a single issue, Careflite and Taton contend that Taylor's claims against them are health care liability claims governed by Texas Civil Practice and Remedies Code chapter 74 and that Taylor failed to comply with chapter 74's expert report requirements. We agree with Careflite and Taton and reverse the trial court's order denying their motion to dismiss and remand this case to the trial court for further proceedings in accordance with this opinion.

## II. BACKGROUND

### A. Pleadings

On November 28, 2017, Taylor filed his original petition against Careflite and Taton as well as Baylor Scott & White Health d/b/a The Heart Hospital Baylor Denton (Baylor).[1] In the petition, Taylor alleges that he underwent a coronary artery bypass graft at Baylor on December 1, 2015. Baylor arranged for Taylor to be transferred to Select Rehab on December 5, 2015, for additional physical therapy and recovery. Careflite was hired to transport Taylor, and Taton,[2] who was alleged to be

---

[1]The allegations against Baylor are not at issue in this appeal.

[2]The petition erroneously states that "Defendant, Nathan *Taylor*[,] was scheduled to pick up Plaintiff[.]" (emphasis added).

an employee or agent of Careflite, was scheduled to pick up Taylor at Baylor on December 5, 2015.

According to the petition, Taylor was discharged from Baylor in a wheelchair, with his personal belongings placed in a plastic bag and hung on the back of the wheelchair. Careflite dispatched Taton to transport Taylor with a handicap accessible van. After accepting him into his care, Taton placed Taylor in his wheelchair in the vehicle. Taylor asserts that Taton failed to remove the bag of personal possessions from the back of the wheelchair and failed to use straps to secure the wheelchair in place or to secure Taylor in the wheelchair prior to transport. When Taton drove onto the highway, Taylor's wheelchair tipped over backward. Taylor allegedly struck his head and slid backward on the floor of the van.

In his petition, Taylor alleges that Taton:

negligently, carelessly, and recklessly disregarded and breached his legal duty to exercise ordinary care in one or more of the following ways: (1) Failing to properly secure [Taylor's] wheelchair in the vehicle; (2) Failing to properly secure [Taylor] in the wheelchair for transport; (3) Failing to remove the bag of personal possession[s] hung on the back of the chair to ensure that the [wheelchair] was properly balanced for transport; (4) Failing to use a vehicle adequate to the needs of [Taylor] given his current health condition; and (5) Failing to operate the vehicle at a reasonably safe speed to ensure the safety of [Taylor] as his passenger.

With regard to Careflite, Taylor asserts that it "had a duty to hire, supervise, train, and retain competent employees[,]. . . [and] a duty to ensure that [Taton] was instructed in how to secure a wheelchair for transport, and how to drive a vehicle with

3

a wheelchair in it without the wheelchair tipping over backwards." In addition, Taylor alleged that Careflite "had a duty to ensure that [Taton] was securing wheelchairs and passengers appropriately for transport and following proper safety guidelines for the transport of patients in wheelchairs." In addition to stating that Careflite was vicariously liable for the actions of Taton "under the doctrine of *Respondeat Superior*," Taylor contended that the negligence of Careflite, Taton and Baylor "separately and/or collectively" constituted a direct and proximate cause of his injuries and damages.

Careflite and Taton responded with their answer on January 8, 2018, which included a general denial and numerous affirmative defenses. They specifically "invoke[d] their right to rely on all defenses, protections, provisions, and limitations authorized by Texas Civil Practice & Remedies Code, Chapter 74, Subchapter G, in full."

## B. Expert Report

On April 17, 2018, Taylor filed his "Plaintiff's Amended Notice of Filing Amended Expert Report Pursuant to Tex. Civ. Prac. & Rem. Code 74.351(a)."[3] Attached to the filing were the report and credentials of Robert C. Krause, M.S., EMT-P. Krause is a licensed paramedic. Krause's report is four pages, and his credentials cover ten pages.

---

[3]Taylor had filed the original report on February 23, 2018. After objections were filed, Taylor amended the original report.

4

After setting out his credentials and some background facts in the report, Krause states his "opinion" as follows:

> The care and transport of a patient safely and securely is a fundamental function of a medical transport company. A fundamental standard of care in healthcare is to do no harm. The phrase is sometimes recorded as primum nil nocere. Non-maleficence, which is derived from the maxim, is one of the principal precepts of bioethics of all healthcare providers and is a fundamental principle throughout the world. Failing to properly secure both the patient and the conveyance device, in this case a wheelchair, is below the standard of care of ensuring safe transportation. The expectation is a patient such as Mr. Taylor[] is transported safely, without falling or being toppled out of their [wheelchair] while in a moving vehicle. Falling backwards in a wheelchair[] while in the wheelchair van is unacceptable and falls below the standard of care of ensuring safe transportation. Section 37.173 of the DOT ADA regulations requires operators to train their personnel to properly assist and treat individuals with disabilities with sensitivity[] and to operate vehicles and equipment safely. Failing to properly secure both the wheelchair and Mr. Taylor with the use of a lap belt and shoulder belt is below the standard of care of ensuring safe transportation. Section 38.23(d) of the DOT ADA regulations requires all ADA-compliant buses and vans to have a two-part securement system, one to secure the wheelchair, and a seat belt and shoulder harness for the wheelchair user. The Careflite driver, Nathan Taton, failed to ensure Mr. Taylor was safely secured to the wheelchair and the wheelchair van, and as a result of his failures, Mr. Taylor flipped over backwards while being transported. This carelessness and inattention to detail for the safety and security of Mr. Taylor, on the part of Nathan Taton[,] resulted in an additional visit to an emergency department for Mr. Taylor. It is my opinion this fall was foreseeable[] (not securing a wheelchair could fall) and preventable (properly securing [wheelchair] would have prevented the flipping backwards).

## C.    Objections and Motion to Dismiss

In response, Careflite and Taton filed their objections to the amended report on May 8, 2018, and their motion to dismiss on May 10, 2018. In the motion, they

5

argue that Taylor "wholly ignored the critical statutory requirement to serve a report that addressed the issue of causation." Careflite and Taton contend that "a licensed physician who is otherwise qualified under the rules of evidence must opine on the issue of causation." In addition, they urge that "[n]on-physician emergency medical technicians, paramedics, and registered nurses are statutorily disqualified from offering such opinions."[4]

## D. Response to Objections and Motion to Dismiss

In his response to the objections, Taylor makes two arguments. First, Taylor contends that "this is a general negligence or safety standards based claim" and does not fall within the purview of section 74.351. Tex. Civ. Prac. & Rem. Code Ann. § 74.351. He argues that he should not be held to a higher burden to provide an expert report simply because Careflite and Taton are healthcare providers; the standard should be no higher than it would be if "the transportation was on a city bus, taxicab, or ride share operator, like Uber or Lyft."

Second, he argues that the medical records should be considered in addition to the report by Krause. According to Taylor, his treating physician, Dr. James Guess, states multiple times in his records that the "[m]echanism of injury is as he was sitting in his wheelchair[,] it turned over." Therefore, Taylor contends that, in determining

---

[4]Careflite and Taton also note that they pointed out these same deficiencies in response to the original report. And, at that time, Taylor still had time to provide an additional report on causation that was authored by a licensed physician.

whether he complied with the reporting requirements of section 74.351, the court can also consider Taylor's other medical records.

## E.    The Trial Court's Ruling

On September 7, 2018, the trial court held a hearing on the objections to Krause's report and motion to dismiss. At the conclusion of the hearing, the trial court stated that the expert report was "sufficient against Careflite." On November 2, 2018, the trial court signed an order denying the motion to dismiss and overruling the objections to the expert report of Krause as to Careflite and Taton.[5] Thereafter, Careflite and Taton filed this interlocutory appeal.

## III. DISCUSSION

## A.    Law Governing Medical-Expert Reports

The Texas Medical Liability Act (Act) requires a claimant pursuing a "health care liability claim" to timely serve an adequate expert report. *See Id.* § 74.351(a) (requiring service of an adequate expert report within 120 days after the original answer is filed, absent a statutorily permitted exception). Failure to do so requires dismissal with prejudice. *Id.* § 74.351(b)(2); *see also Scott and White v. Weems*, No. 17-0563, 2019 WL 1867916, at *1 (Tex. April 26, 2019). In the healthcare-liability

---

[5]Prior to entering the order denying the motion to dismiss of Careflite and Taton, the trial court entered an order granting the motion. Subsequently, the trial court entered an order vacating the order of dismissal.

context, an expert report is required to ensure that only claims with "potential merit" proceed. *Samlowski v. Wooten*, 332 S.W.3d 404, 410. (Tex. 2011).

> The Act defines a health care liability claim as:
>
> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13). Health care liability claims must satisfy the following three elements: (1) a physician or health care provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury to the claimant. *Psychiatric Solutions, Inc. v. Palit*, 414 S.W.3d 724, 725 (Tex. 2013) (quoting *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 179-80 (Tex. 2012)).

In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1)    Is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

8

(2)     Has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)     Is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(1)–(3).

An expert who gives an opinion on causation must meet all of the following qualifications: (1) the expert must be a licensed physician; and (2) the expert must be otherwise qualified to give an opinion on the causal relationship under the Texas Rules of Evidence. *Id.* § 74.403(a). A "physician" is a person who is licensed to practice medicine in one or more states in the United States. *Id.* § 74.401(g)(1). An expert witness may be qualified to opine on one issue but not another. *Id.* § 74.351(i); *In re Buster*, 275 S.W.3d 475, 477 (Tex. 2008).

**B.     Standard of Review**

A trial court's decision whether to dismiss a health care liability claim based on a plaintiff's failure to comply with section 74.351's expert report requirement is reviewed for abuse of discretion. Tex. Civ. Prac. & Rem. Code Ann. § 74.351; *see, e.g., Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006) (per curiam); *see also Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). Under this standard, we defer to the trial court's factual determinations if supported by the evidence but review its legal determinations de novo. *See Van Ness*, 461 S.W.3d at 142. An abuse occurs if the trial court rules without reference to guiding rules or principles or

9

renders a decision lacking support in the facts or circumstances of the case. *See Samlowski*, 332 S.W.3d at 410.

When the issue presented requires statutory interpretation or a determination of whether chapter 74 applies to a claim, that is a question of law to which appellate courts apply a de novo standard of review. *See Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011). Whether a claim is a health care liability claim under the Act is a question of law we review de novo. *Christus Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 534 (Tex. 2016).

## C. Analysis

### 1. Whether This is a Health Care Liability Claim

Taylor does not dispute that Careflite and Taton qualify as "health care providers." In addition, he "agrees that there is a causal relationship between the alleged act or omission and the complained of injury which satisfies the third element." Rather, he disputes whether section 74.351's second element—whether the claim concerns treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care—is met.

Careflite and Taton contend that "Taylor's claim involves an alleged departure from accepted standards of health care because Taylor was a patient in and under the care of Careflite and Taton at the time of the alleged incident." Alternatively, they argue that "Taylor's claim involves an alleged departure from accepted standards of

10

safety because the underlying facts and Taylor's allegations demonstrate that a substantive nexus exists between the allegedly violated safety standards and the provision of health care."

The determination of whether a cause of action is a health care liability claim is based on an evaluation of the facts alleged and the underlying nature of the claim. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 847, 851 (Tex. 2005). "A cause of action alleges a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services." *Id.* at 848. If the essence of the suit is a health care liability claim, a party cannot avoid the requirements of section 74.351 through artful pleading. *Id.* at 851.

At issue here is the nature of Taylor's cause of action, a phrase that refers to the "fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief." *Scott and White*, 2019 WL 1867916, at *4 (citing *In re Jorden*, 249 S.W.3d 416, 421 (Tex. 2008) (quoting *A.H. Belo Corp. v. Blanton*, 133 Tex. 391, 129 S.W.2d 619, 621 (1939))). We focus on whether or not the gravamen of Taylor's complaint is a "claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." *Id.* (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) and *Christus Health*, 505 S.W.3d at 534).

Careflite and Taton argue that the underlying factual background of Taylor's December 5, 2015, medical transport, as set out in his original petition, states a claim

11

premised upon departures from accepted standards of health care and departures from accepted standards of safety. In his petition, Taylor alleges that Careflite "failed to dispatch an appropriate vehicle to transport [him] commensurate with his health status three days after having open heart surgery." In addition, Taylor states that Taton "accepted [Taylor] into his care, although he should have recognized that [Taylor's] health condition required a higher degree of care than he and his vehicle were equipped to provide." And, after accepting Taylor into his care, Taton "failed to remove the bag of personal possessions from the back of the wheelchair and failed to use straps to secure the wheelchair in place or to secure [Taylor] in the wheelchair prior to transport."

At least one of our sister courts has addressed claims similar to those here and found that they met the definition of a health care liability claim. *Sherman v. Healthsouth Specialty Hosp., Inc.*, 397 S.W.3d 869 (Tex. App.—Dallas 2013, pet. denied). In *Sherman*, the plaintiff claimed injuries after a medical clinic employee allegedly failed to properly secure her and her wheelchair in a van to her home. The plaintiff argued that her "medical dealings" with the rehabilitation hospital had been completed, and the tangential relationship "does not somehow transform a mere van ride into an integral part of health care services." *Id.* at 874. In determining the claim to be a health care liability claim, the court pointed out that a direct connection between the act or omission causing injury and the provision of health care is not necessary for purposes of determining whether a claim is a health care liability claim. *Id.* While the

12

health care provider was not providing the plaintiff medical care or treatment at the time its driver suddenly applied his brakes, the health care provider was still responsible for the plaintiff's safety during transport from the clinic to her home. *Id.*; *see Bain v. Capital Senior Living Corp.*, No. 05-14-00255-CV, 2015 WL 3958714, *4 (Tex. App.—Dallas June 30, 2015, pet. denied) (mem. op.) (holding that claims alleging failure to secure a claimant into her wheelchair and applying the brakes with excessive force causing the claimant to fall from her wheelchair were health care liability claims); *see Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 395 (Tex. 2011) (holding that the term "health care" encompasses any act or treatment performed or furnished by a health care provider).

Similarly, we conclude that Taylor's claims involve allegations of departures from accepted standards of care because Taylor was a patient in and under the care of Careflite and Taton at the time of the alleged incident. In addition, Taylor's pleadings allege that Careflite and Taton failed to recognize that a patient in Taylor's medical condition was not medically qualified to undergo a wheelchair transport and should have instead been transported via a stretcher in a supine position. Taylor also contends that the transport should have been completed by an ambulance unit with the necessary medical equipment to care for a patient in Taylor's condition. All of the allegations involve an alleged departure from accepted standards of health care.

Taylor also relies upon *Nexus Recovery Ctr. v. Mathis*, 336 S.W.3d 360 (Tex. App.—Dallas 2011, no pet.) for the proposition that his claim does not concern

13

treatment or lack of treatment as defined by the Act. However, *Nexus* involved allegations of an inappropriate intimate, sexual and financial relationship between a patient of a residential drug and alcohol treatment facility and an employee counselor of the facility which began after the patient left the care of the treatment program. *Id.* at 363. In *Nexus*, unlike here, the plaintiff never raised complaints related to her care as a patient. *Id.* Rather, the only relationship to health care was in the sense that the plaintiff and former employee counselor first met when the plaintiff was a patient at Nexus. *Id.*

In addition, Taylor's claims implicate duties to provide for patient safety because a substantive nexus exists between the allegedly violated safety standards and the provision of health care. In *Ross v. St. Luke's Episcopal Hospital*, 462 S.W.3d 496, 502 (Tex. 2015), the supreme court set forth a list of non-exclusive considerations to help courts determine whether there is a substantive nexus between the safety standards allegedly violated and the provision of health care:

(1) Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;

(2) Did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special, medical care was implicated;

(3) At the time of the injury was the claimant in the process of seeking or receiving health care;

14

(4) At the time of the injury was the claimant providing or assisting in providing health care;

(5) Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;

(6) If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; or

(7) Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

*Id.* at 505.

Several of these factors further support our conclusion that Taylor's claim is a health care liability claim. For example, and similar to the facts in *Bain*, Taton's alleged misuse of the straps to secure the wheelchair in place or to secure Taylor in the wheelchair prior to transport was a task performed with the purpose of protecting a patient from harm. *Bain*, 2015 WL 3958714, at *4. And the instrumentality involved—Taylor's wheelchair—is the type of instrumentality used in providing health care. Taylor's argument that his transport by Careflite and Taton is no different than the services provided by a taxi company or Uber or Lyft ignores his status as a post-heart-surgery patient and disregards the status of Careflite and Taton as licensed health care providers.

Therefore, we conclude that Taylor's allegations not only involve departures from accepted standards of care but also implicate duties to provide for patient safety.

15

Therefore, they are health care liability claims and are governed by the provisions of chapter 74. Tex. Civ. Prac. & Rem. Code Ann. § 74.001 et seq.

### 2. Whether Medical Records Suffice for an Opinion on Causation

Taylor's only expert report was provided by Krause. It is undisputed that he is not a physician, but rather, as described by Taylor, "an expert in the field of EMT – Paramedics qualified to give expert opinions on patient transport and handling." If Krause's report is insufficient, Taylor argues that he has "complied with the requirements [of chapter 74] by proffering the report of a qualified expert in conjunction with the medical records provided in response to Requests for Disclosures."[6] Indeed, in his response to the motion to dismiss, Taylor attached as exhibits over one hundred pages of medical records from healthcare providers seen on or after December 5, 2015.

However, medical records have consistently been rejected as constituting an adequate chapter 74 expert report. *See Maxwell v. Seifert*, 237 S.W.3d 423, 427 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also Milton v. Nguyen*, No. 01-11-00958-CV, 2012 WL 3228835, at *1 (Tex. App.—Houston [1st Dist.] August 9, 2012, pet. denied) (mem. op.); *Univ. of Tex. Med. Branch at Galveston v. Callas*, 497 S.W.3d 58, 67 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). In addition, even though

---

[6]Specifically, Taylor contends that the medical records from OrthoTexas of Dr. James Guess and Dr. Richard Burg "state that the mechanism of Taylor's injuries were the incident in which his wheelchair turned over."

16

required by section 74.351(a), no curriculum vitae of Guess or any other licensed physician affiliated with the hundreds of pages of medical records was supplied. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

While Taylor cites to *Kettle v. Baylor Medical Center*, 232 S.W.3d 832 (Tex. App.— Dallas 2007, pet. denied) for his proposition that medical records can be considered in conjunction with a report, neither *Kettle* nor chapter 74 allow medical records to be substituted in place of a section 74.351 expert report. Rather, both support the conclusion here that only an expert report by a licensed physician can satisfy the requirements of chapter 74.

In *Kettle*, the plaintiffs brought a health care liability claim against a number of health care providers. *Id.* at 836. To satisfy the expert report requirements of article 4590i, the predecessor statute to chapter 74, the plaintiffs served reports from an internist/cardiologist and a registered nurse. *Id.* at 837–41. In addition to other matters, both reports stated opinions on medical causation. In response to objections to the adequacy of the reports, the Dallas court held that the registered nurse was not qualified to testify on medical causation. *Id.* at 841. However the court did consider the causation opinions included within the doctor's report. *Id.* at 841–42.

In this case, unlike in *Kettle*, Taylor submitted only a report from a non-physician. He did not submit a report from any physician. Moreover, the *Kettle* plaintiffs did not attempt to rely upon medical records to satisfy the mandatory minimum requirements of an expert report.

17

In addition, in deciding whether a report is compliant with chapter 74, the trial court is to examine only the four corners of the expert's report and may not draw inferences or otherwise supply links in the causal chain. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). Examining medical records outside the report does not comply with this four-corner requirement.

Therefore, we conclude that Taylor's allegations concern claimed departures from accepted standards of health care and safety services directly related to health care, and the trial court abused its discretion by denying Careflite and Taton's motion to dismiss. We sustain this portion of Appellants' issue.

### 3. Whether Appellee is Entitled to a Thirty-Day Extension

In his brief, Taylor requests that in the event we sustain Careflite and Taton's issue, he be granted a thirty-day extension to remedy any deficiencies "since he filed his reports in good faith." In response, Careflite and Taton argue that Taylor "elected to wholly ignore and disregard causation, one of the three mandatory elements of a section 74.351 report, by serving a non-compliant report from a non-physician who is statutorily disqualified from offering medical causation opinions." Therefore, they contend that "Taylor's report from Krause, EMT-P was not a good faith effort because it omitted one of the three statutory requirements," and therefore, he is not entitled to any extension of the section 74.351 expert report deadline. In addition, in

their motion to dismiss, Careflite and Taton urged that Taylor's "purported expert report" is "akin to no report at all."

Section 74.351 does distinguish between a report that is timely served but deficient and when no report is served. If a report is timely served but deficient, the trial court may grant an extension to cure the deficiency, and no appeal lies from the extension order. *Villarreal v. Fowler*, 526 S.W.3d 633, 635 (Tex. App.—Fort Worth 2017, no pet.); *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c) ("If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency.").

In distinguishing between a deficient report and no report, we are guided by the supreme court's decision in *Scoresby v. Santillan*, 346 S.W.3d 546 (Tex. 2011). In *Scoresby*, the court explained that when a trial court finds deficiencies within an expert report, it should "err on the side of granting the additional time and must grant it if the deficiencies are curable." *Id.* at 549. Further, the court explained that an individual's "lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so." *Id.*

In describing when a claim should be dismissed instead of giving an opportunity to cure, the court stated,

19

> We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if [1] the report is served by the statutory deadline, if [2] it contains the opinion of an individual with expertise that the claim has merit, and if [3] the defendant's conduct is implicated. We recognize that this is a minimal standard, but we think it is necessary if multiple interlocutory appeals are to be avoided, and appropriate to give a claimant the opportunity provided by the Act's thirty-day extension to show that a claim has merit. All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case.

*Id.* at 556–57; *compare Villarreal*, 526 S.W.3d at 636 (holding that a "Clinical Review" fails the minimal expert-report standard because instead of opining that a claim has merit, its author opined that several ethical rules were violated and recommended consultation with an attorney); *Haskell v. Seven Acres Jewish Senior Care Servs., Inc.*, 363 S.W.3d 754, 760 (Tex. App.—Houston [1st Dist.] 2012, no. pet.) (holding that letters from cardiologist, neurologist and psychologist that failed to state that a claim had merit did not constitute an expert report); *Rivenes v. Holden*, 257 S.W.3d 332, 339 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that expert report that did not refer to physician by name or position and that offered no opinions concerning the physician's conduct did not implicate that physician's conduct); *Apodaca v. Russo*, 228 S.W.3d 252, 257 (Tex. App.—Austin 2007, no pet.) (concluding that if a report fails to address a defendant physician, it constitutes no report and an extension may not be granted); *Garcia v. Marichalar*, 198 S.W.3d 250, 255 (Tex. App.—San Antonio 2006, no pet.) (concluding that report that did not name doctor or

20

discuss how the treatment did not meet standard of care did not constitute good-faith effort).

In urging that Taylor is not entitled to an extension, Careflite and Taton also note that they put Taylor on notice of the "fatal omission of causation opinions from a licensed physician during the prescribed 120 day period," yet he still did not comply. However, as this Court has previously noted, "[P]enalizing a plaintiff for declining to fix a report's alleged deficiencies before a trial court rules on objections to the report would be unreasonable and contrary to the purpose of section 74.351(c), which is to grant an opportunity to cure after 'elements of the report are found deficient.'" *Gower v. Univ. Behavioral Health of Denton*, No. 02-16-00245-CV, 2017 WL 3081153, at \*12 (Tex. App.—Fort Worth July 20, 2017, no pet.) (mem. op.) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c)).

Applying *Scoresby's* standards here, we conclude that the trial court is in the best position to decide whether a cure for an inadequate expert report is feasible. *Protzman v. Gurrola*, 510 S.W.3d 640, 654–55 (Tex. App.—El Paso 2016, no pet.). Therefore, it is appropriate to remand the case to the trial court for consideration of whether the deficiencies in the expert report can be cured, and therefore, whether to grant an extension of time. *Id.* at 655.

## IV. CONCLUSION

Having agreed with Appellants Careflite and Taton that the allegations of Appellee Taylor are health care liability claims governed by section 74.351 and that

Taylor failed to comply with chapter 74's expert report requirements, we reverse the trial court's order denying their motion to dismiss and remand this case to the trial court for further proceedings in accordance with this opinion. *See* Tex. R. App. P. 43.2(d).

/s/ Dana Womack

Dana Womack
Justice

Delivered: June 27, 2019