

# NUMBER 13-21-00135-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**OCTAVIO AGUILERA; THE SCHUMACHER
GROUP OF TEXAS, INC.; VHS HARLINGEN
HOSPITAL COMPANY, LLC D/B/A VALLEY
BAPTIST MEDICAL CENTER-HARLINGEN;
ADRIAN ALANIZ; KRISTEN WHITE;
GEORGE HUDDLESTON, IV, M.D.;
AND WILLIAM TAW, M.D.,**                                          **Appellants,**

**v.**

**ELIAZAR COSTILLA, INDIVIDUALLY AND
AS THE REPRESENTATIVE OF THE ESTATE
OF KRISTY RENEE COSTILLA, DECEASED,
AND AS NEXT FRIEND OF A.J.C. AND C.K.C.,
MINORS; MELINDA RODRIGUEZ LEAL;
AND CAMILO TREVINO,**                                          **Appellees.**

**On appeal from 197th District Court
of Cameron County, Texas.**

# MEMORANDUM OPINION

## Before Justices Benavides, Tijerina, and Peña
## Memorandum Opinion by Justice Tijerina

Appellants Octavio Aguilera, The Schumacher Group of Texas, Inc. (SGT), VHS Harlingen Hospital Company, LLC d/b/a Valley Baptist Medical Center-Harlingen (VBM), Adrian Alaniz, Kristen White, George Huddleston IV, M.D., and William Taw, M.D. appeal the trial court's denial of their Chapter 74 motions to dismiss in a healthcare liability claim brought by appellees Eliazar Costilla, individually and as the representative of the estate of Kristy Renee Costilla, deceased, and as next friend of A.J.C. and C.K.C., minors; Melinda Rodriguez Leal; and Camilo Trevino. Appellants assert that appellees' expert reports fail to comply with § 74.351 of Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (providing for expert report requirements in health care liability actions); *id.* § 51.014(a)(9) (providing for interlocutory appeal of an order denying relief under § 74.351).

Aguilera and SGT further argue that the trial court abused its discretion in overruling their objections to appellees' expert reports and denying their motion to dismiss because the report was so lacking, it constituted "no report" and was incurable.

Dr. Huddleston argues the trial court erred in denying his motion to dismiss because the expert reports failed to implicate him, failed to state a standard of care applicable to him, failed to specify how he breached a standard of care, and failed to explain how an alleged breach caused Kristy's injuries.

White and Alaniz argue the expert reports were deficient because one expert is unqualified as a matter of law, and there is no causal link between their alleged breaches

2

and Kristy's death. White additionally argues the alleged standard of care within the report would require her to violate the Nurse Practice Act. Alaniz further argues that the report shows his alleged breaches occurred after Kristy suffered irreversible brain ischemia that caused brain death.

VBM asserts the trial court should have granted its motion to dismiss because there were no expert reports that established an alleged direct negligence claim against it, and the expert reports identifying the hospital's employees, White and Alaniz, were insufficient.

Dr. Taw asserts the expert reports failed to properly establish the applicable standard of care as applied to him and failed to properly establish that he breached a standard of care, which resulted in Kristy's injuries.[1]

We reverse and remand.

## I.  BACKGROUND

The underlying proceeding arose following Kristy's death on September 25, 2018. On September 24, 2018, forty-one-year-old Kristy arrived at VBM with symptoms of a hemorrhagic stroke. Following a CT scan, Kristy was diagnosed with a subarachnoid hemorrhage (brain bleed) at 9:30 p.m., and she was transferred to the Intensive Care Unit at 11:50 p.m. At approximately 3:10 a.m., Kristy began experiencing seizures again. She was intubated and put on mechanical ventilation. Ultimately, her condition worsened, and she passed away at 5:01 p.m. on September 25, 2018.

---

[1] We refer to the decedent by her first name for ease of reference.

3

On September 22, 2020, appellees filed a healthcare liability claim against several medical professionals and entities, including: a hospital (VBM), two nurses (Alaniz and White), a nurse practitioner (Aguilera) and his employer (SGT), a hospitalist (Dr. Huddleston), a radiologist (Dr. Taw), and three other physicians.[2] Appellees alleged VBM's staff was negligent as they "failed to accurately assess and document [Kristy's] deteriorating condition." According to appellees' petition, nurses White and Alaniz failed to recommend to a physician the need for an emergency CT scan of Kristy's head after her neurological status deteriorated. They asserted VBM was negligent in training and supervising its staff and in failing to ensure that neurosurgical or neuro-interventional services were always available. Appellees further alleged that Dr. Taw erroneously interpreted Kristy's CT scan, which precluded further treatments. Appellees did not allege any specific action or inaction of Dr. Huddleston other than general negligence.

Appellees filed three expert reports by Van V. Halbach, M.D., Michael Griffith, R.N., and Erwin A. Cruz, M.D. in accordance with § 74.351. *See id.* § 74.351(a) ("In a health care liability claim . . . a claimant shall . . . serve on [a defendant health care provider] one or more expert reports, with a curriculum vitae [CV] of each expert listed in the report.").

On November 4, 2020, Dr. Huddleston filed a motion to dismiss, asserting he was a hospitalist physician who is board certified in internal medicine; therefore, appellees' experts consisting of a radiologist, a neurologist, and a nurse practitioner, were not qualified to render a medical opinion as to him. Furthermore, he alleged the expert reports

---

[2] These physicians are Atiya Dhala, M.D., Alicia Hart, M.D., and Wondwossen Tekle, M.D. None are parties to this appeal. After granting appellees one thirty-day extension to cure deficiencies in the expert report, the trial court granted Dr. Dhala's second motion to dismiss appellees' claims against her with prejudice. Appellees appealed, and that appeal is currently pending before us in a separate cause number.

4

failed to set forth a standard of care, an alleged breach, and causation as to his actions or inactions specifically.

On December 11, 2020, Aguilera and SGT filed objections to the expert reports. They asserted: (1) the experts were unqualified as to Aguilera, a nurse practitioner, (2) Griffith was unqualified to render medical causation opinions, (3) the experts failed to provide their CV as required by Chapter 74, and (4) the reports were insufficient as to standard of care, breach, and causation. They subsequently moved to dismiss, contending that the expert reports failed to represent a "good faith" effort to comply with the statute. *Id.* § 74.351(l) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report . . . .").

On April 1, 2021, VBM, Alaniz, and White filed a motion to dismiss, asserting: (1) Dr. Cruz was unqualified to offer a nurse's standard of care opinion, (2) Dr. Cruz's opinions were conclusory, and (3) Dr. Cruz failed to establish causation. They further asserted Griffith was unqualified to render causation opinions because he was not a physician. Lastly, they challenged Dr. Halbach's report asserting it: (1) was conclusory and vague, (2) failed to address Kristy's morbidity and mortality, and (3) failed to show harm but for their alleged negligent acts.

Dr. Taw filed a motion to dismiss and objected to Dr. Halbach's report, asserting it failed to set forth the standard of care for a radiologist, failed to connect any alleged breaches to him, and failed to explain how his alleged negligence caused injury and death.

On April 13, 2021, appellees filed one response to all the motions to dismiss, generally asserting that the reports were sufficient and attaching each expert's CV. According to appellees, the standard of care is "one size fits all," and their reports identified a breach of the "one size fits all" standard because all physicians failed to diagnose an impending brain herniation. Following a hearing, the trial court denied appellants' motions to dismiss. This appeal followed.[3]

## II.    STANDARD OF REVIEW & APPLICABLE LAW

Texas Civil Practice and Remedies Code provides that a plaintiff in a health care liability suit must serve the medical defendant with an expert report that complies with § 74.351 and is accompanied by the expert's CV. *See id.* § 74.351. If a plaintiff fails to do so within 120 days after the defendant's original answer is filed, then the trial court must dismiss the claim with prejudice on the defendant's motion. *Baty v. Futrell*, 543 S.W.3d 689, 692 n.1 (Tex. 2018); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (b)(2).

The goal is "to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (citing *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011)); *see also Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). Therefore, the expert report requirement is a low threshold that merely demonstrates that a claim is not frivolous. *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012). It must provide a fair summary of

---

[3] Appellants objected to the expert reports on several grounds, including whether the experts were qualified to render an opinion on a nurse practitioner. For purposes of this analysis, we will assume, but not decide, that the experts were qualified.

the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

"A trial court must sustain a challenge to a report's adequacy if the report does not represent an objective good faith effort to provide a fair summary of the applicable standard of care, the defendant's breach of that standard, and how that breach caused the patient's harm." *Miller v. JSC Lake Highland Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam) (cleaned up); *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(l), (r)(6). "A good-faith effort must 'provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide the basis for the trial court to conclude that the claims have merit." *Miller*, 536 S.W.3d at 513 (quoting *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam)). All information needed for this inquiry is found within the four corners of the expert report, which need not marshal all the plaintiff's proof. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010) (citing *Am. Transitional Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)). A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. *Palacios*, 46 S.W.3d at 879; *New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *see Scoresby*, 346 S.W.3d at 556 ("No particular words or formality are required, but bare conclusions will not suffice.").

7

If there are multiple defendants in a suit, the report must be sufficient as to each defendant individually. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *see also Rivenes v. Holden*, 257 S.W.3d 332, 336 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that if a plaintiff does not serve a report as to a particular defendant, the trial court must dismiss that defendant from the suit). A claimant can fail to serve an expert report as to a defendant when "a claimant serves a report in an attempt to satisfy all the requirements for an expert report" as to other defendants, but the report does not implicate the conduct of the defendant in question. *Thomas v. Torrez*, 362 S.W.3d 669, 672 (Tex. App.—Houston [14th Dist.] 2011, pet. dism'd) (concluding that multiple passing references to a named defendant in an expert report were not sufficient to implicate that defendant, and it was "no report" as to her). In *Scoresby v. Santillan*, the supreme court concluded that a thirty-day extension to cure deficiencies may be granted if: (1) the report is served by the statutory deadline; (2) it contains an opinion of an individual with expertise that the claim has merit; and (3) the defendant's conduct is implicated. 346 S.W.3d at 557. A report as to a particular defendant must implicate the defendant's conduct. *Ogletree v. Matthews*, 262 S.W.3d 316, 322 (Tex. 2007). A report served in a healthcare liability claim, however, does not implicate a defendant's conduct merely because the provider is a named defendant in the lawsuit. *Id.* "[A] defendant's conduct is implicated when an expert report is 'directed primarily' to care provided by the defendant, and the report informs the defendant of specific conduct called into question and provides a basis for the trial court to determine that the claim has merit." *Beckwith v. White*, 285 S.W.3d 56, 62 (Tex. App.—Houston [1st Dist.] 2009, no pet) (citation omitted).

8

We review a trial court's ruling on the sufficiency of an expert's report and on a motion to dismiss for an abuse of discretion. *Jelinek*, 328 S.W.3d at 539; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *Miller*, 536 S.W.3d at 512. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner and without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017).

### III.    "NON-EXISTENT" REPORTS

**A.    Aguilera**

Aguilera argues that the trial court abused its discretion in overruling his objections and denying his motion to dismiss because the expert reports were so lacking, they constituted "no report" and were incurable. We agree.

After reviewing all three expert reports, Aguilera does not appear to be an intended recipient of the reports as the experts do not mention him *or* his conduct in any regard.[4] *See Haskell v. Seven Acres Jewish Senior Care Servs.*, 363 S.W.3d 754, 760–61 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding that a report that did not name a nurse, apply any standard of care or identify any negligent conduct on her part was deemed "no report"). Furthermore, there was no description of any actions Aguilera took or failed to take, much less any action he took or failed to take in relation to Kristy's injuries. *See Garcia v. Marichalar*, 198 S.W.3d 250, 252 (Tex. App.—San Antonio 2006, no pet.) (holding the reports insufficient because they did not mention the physician or

---

[4] We note that appellees submitted a *post*-deadline amended report on October 5, 2021, after the notices of appeal were filed. However, we are unable to rely on documents that were not before the trial court when it made its decision. *See Stankiewicz v. Oca*, 991 S.W.2d 308, 311–12 (Tex. App.—Fort Worth 1999, no pet.).

discuss how the care rendered by him failed to meet the applicable standard of care, or how his failure caused the plaintiff to suffer injury, harm or damages). None of the reports applied a standard of care to Aguilera. *See Laredo Tex. Hosp. Co. v. Gonzalez*, 363 S.W.3d 255, 258–59 (Tex. App.—San Antonio 2012, no pet.) (holding the expert report was conclusory because it made no mention of any healthcare defendant or applicable standard of care). In fact, we are unable to glean from any of the expert reports how Aguilera was in any way involved in treating Kristy on September 24–25. Because there was nothing in any of the reports that linked Aguilera to Kristy's injuries, there was nothing to link the reports' claimed causation to Aguilera. *See Bogar v. Esparza*, 257 S.W.3d 354, 364 (Tex. App.—Austin 2008, no pet.) ("[W]here a defendant is not identified at least in some manner within the 'four corners' of the report, the report is, for that reason alone, deficient as to that defendant because it would require the reader to infer or make an educated guess as to whose actions the expert is complaining.").

We hold that the expert reports fail to contain "a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against [Aguilera] has merit." *Scoresby*, 363 S.W.3d at 549; *Haskell*, 363 S.W.3d at 754 (holding that if a report is so deficient as to constitute no report at all, the twenty-one-day deadline to object is never triggered and the trial court is "required to dismiss"). Accordingly, the reports constitute "no report," and Aguilera was entitled to an automatic dismissal. *See Velandia v. Contreras*, 359 S.W.3d 674, 679 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (stating that dismissal is automatic, regardless of when the defendant objects, if the report filed constitutes no report at all); *Apodaca v. Russo*, 228 S.W.3d 252, 257 (Tex.

10

App.—Austin 2007, no pet.) (holding the report which referred to other health care providers but did not mention the sole defendant or discuss how the defendant breached the standard of care or caused injury was no report as to the defendant); *see also Valley Baptist Med. Ctr.-Brownsville v. Battles*, No. 13-14-00756-CV, 2015 WL 5579819, at *34 (Tex. App.—Corpus Christi–Edinburg June 25, 2015, no pet.) (mem. op.) ("Nonexistent reports lead to dismissal whereas merely deficient reports should lead to a thirty-day extension to allow an opportunity for deficiencies to be cured."). We sustain Aguilera's issue.

## B.    SGT

SGT argues that because the expert reports were nonexistent as to Aguilera, appellees' contingent vicariously liability claim against SGT must fail. When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient. *See Univ. of Tex. Med. Branch v. Railsback*, 259 S.W.3d 860, 864 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Because we concluded the expert reports do not implicate Aguilera's conduct in any way and constitute "no report," in this case, the reports cannot support a vicarious liability claim against SGT. *See id.*; *Battles*, 2015 WL 5579819, at *4. We sustain SGT's issue.[5]

## C.    Dr. Huddleston

Dr. Huddleston argues that the expert reports fail to state the standard of care as applied to him, how he breached that standard, and how his actions caused injury. We agree.

---

[5] We note that Aguilera is the only nurse practitioner identified as an employee of SGT.

11

Appellees named eleven defendants in their pleadings, yet the expert reports do not set forth the standard of care for Dr. Huddleston, do not explain how Dr. Huddleston deviated from the standard of care, and do not give insight as to how Dr. Huddleston's actions caused Kirsty's injuries. If a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 244 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.). In fact, Dr. Cruz's report completely fails to mention Dr. Huddleston's conduct. *See Sinha v. Thurston*, 373 S.W.3d 795, 800–01 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (providing that an expert report that did not name the physician or implicate his conduct constituted no report as to the physician); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stating that the expert report must provide specific information about what each defendant would have done differently).

Although Dr. Halbach mentions Dr. Huddleston in his report, he only addresses Dr. Huddleston's role in Kristy's medical care in a single sentence: "Dr. Hart had a phone consult with Dr. Tekle, an interventional neurologist who is trained to treat ruptured aneurysms and Dr. Huddington,[6] [sic] an internist." That is the extent of Dr. Halbach's purported evaluation and critique of Dr. Huddleston. Nonetheless, appellees argue that Dr. Huddleston is "identified in the treatment team that admitted Kristy." But "when an

---

[6] Appellees refer to their expert's naming of "Dr. Huddington," instead of Dr. Huddleston, as "scrivener's error."

12

expert opines about the care provided by more than one physician, the report must refer to each physician by name and state the standard of care with regard to that physician." *Baylor Univ. Med. Ctr. v. Briggs*, 237 S.W.3d 909, 921 (Tex. App.—Waco 2007, pet denied). Dr. Cruz's single-sentence reference to a "Dr. Huddington" does not state what Dr. Huddleston did or failed to do that caused Kristy's injuries. *See Marichalar*, 198 S.W.3d at 254 (noting that although plaintiff's allegations focus on a single incident, the statute nevertheless requires that an expert report "explain how the care rendered by the physician failed to meet the applicable standard of care and the causal relationship between the failure and the injury suffered by the claimant"). Dr. Halbach does not criticize Dr. Huddleston, attribute any standard of care to Dr. Huddleston, or explain why Dr. Huddleston's actions fell below the standard of care. *See Longino v. Crosswhite*, 183 S.W.3d 913, 915 (Tex. App.—Texarkana 2006, no pet.) (providing that a report is sufficient only if it provides "specific information about what the defendant should have done differently); *see also Hernandez v. Ebrom*, No. 13-06-053-CV, 2010 WL 1804971, at *4 (Tex. App.—Corpus Christi–Edinburg May 6, 2010, no pet.) (mem. op.) (holding that the expert report is deficient when "[i]t does not state who performed the surgery . . . [and] the report never mentions either defendant in the body of the report").

The purpose of the expert report requirement is to inform the defendant health care provider of the specific conduct called into question and provide a basis for the trial court to conclude that the plaintiff's claims have merit. *See Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex. 2006) ("[E]ven if we assume that the reports address the standard of care with respect to each doctor, . . . neither report addresses how Dr. Jernigan breached the

13

standard or how his unstated breach of duty caused John's death with sufficient specificity for the trial court, and Jernigan, to determine that the allegations against Jernigan had any merit."). We are unable to determine how Dr. Huddleston was involved in Kristy's care other than a "phone consult" with a doctor that is not a party to this appeal. Because appellees' expert reports do not accuse Dr. Huddleston of any wrongdoing and do not implicate Dr. Huddleston's conduct, the reports are "so lacking," as to constitute no report. Accordingly, the trial court should have properly granted Dr. Huddleston's motion to dismiss with prejudice. *See Scoresby*, 346 S.W.3d at 557; *Haskell*, 363 S.W.3d at 754. We sustain Dr. Huddleston's sole issue. *See Rivenes v. Holden*, 257 S.W.3d 332, 338 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("As a result, [the expert report] cannot be considered merely deficient as to appellant; it is, in fact, no report at all as to him.").

## D.    Summary

We recognize that "even when a report is deemed not served because it is deficient, the trial court retains discretion to grant a thirty[-]day extension." *Ogletree*, 262 S.W.3d at 320–321. "Although the distinction between 'no report' and a deficient-but-potentially curable report can be elusive," we conclude that the expert reports as to Aguilera, SGT, and Dr. Huddleston are "no report," such that a dismissal of the actions against them was required without an opportunity to cure the report. *See Bogar*, 257 S.W.3d at 368 (providing that the report constituted "no report" as it did not identify whose conduct was responsible for the decedent's death and a dismissal was required without any opportunity to cure the report).

14

## IV.    DR. TAW, WHITE, ALANIZ, AND VBM

### A.    Dr. Taw

Dr. Taw argues that appellees' expert reports are inadequate as to the standard of care and causation as to him because he is a radiologist, and the reports do not differentiate a standard of care applicable to him.

Dr. Halbach's entire evaluation of Dr. Taw is as follows:

> The first physician to fall below the standard of care was the radiologist Dr. William Taw, who *interpreted* the CT arteriogram on 9/25/2018 performed at 1:04[ ]A[.]M. The images or picture and reconstructions of the cerebral arteries were made of the right internal carotid artery and vertebral arteries, but there was [sic] no images (pictures) reconstruction of the left internal carotid artery which should have been performed and would have shown the correct location of the aneurysm location, origin and neck attachment important in deciding subsequent treatment. The failure to obtain these images (pictures) prevented recognition of a possibly treatable aneurysm . . . . Even without these reconstruction [sic] the origin from the left internal supraclinoid artery was clear on the imaging but reported by Dr. Taw who *incorrectly described* the aneurysm as in the region of the anterior cerebral artery . . . . This mistake precluded an easier treatment of her aneurysm from inside of blood vessels which is one of two possible treatments. (Emphasis added).

### 1.    Did all the physicians owe Kristy the same duties?

In large part, the dissent reiterates that "all the report needs to do" at this stage is to (1) inform the defendant of the specific conduct appellees have called into question and (2) provide a basis for the trial court to conclude that the claims have merit. We agree that these are relevant standards, but an expert is nonetheless required to explain a standard of care, a breach of the standard of care, causation, and damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). A report that does not fulfill one of these requirements cannot provide a basis for the trial court to conclude that the claims have

15

merit. *See id.* In this regard, appellees request that we adopt a "one-size-fits-all" standard of care applied to all physicians.

Here, appellants are comprised of diverse medical professionals and entities. Dr. Halbach's expert report does not differentiate between the standards of care for the different physicians, such as Dr. Taw, Dr. Clay Padington, Dr. Hart, Dr. Wondwossen Telke, and Dr. Dones. We refuse to adopt a "one-size-fits-all" standard, regardless of the physicians' expertise, to conclude that each physician was required to adhere to the same standard of care where the experts do not state that each medical professional was required to adhere to the same standard. *See Palacios*, 46 S.W.3d at 880 ("Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently."); *see also Norberg v. Ameel*, No. 13-18-00165-CV, 2019 WL 6906559, at *3 (Tex. App.—Corpus Christi–Edinburg Dec. 19, 2019, pet. denied) (mem. op.) (finding the expert report adequate because the expert expressly opined that the standard of care for attending physicians *and* interventional radiologists such as those *individually* named was the same and thus was not required to set out the different standard when he accused both of breaching the same conduct). "An expert report concluding that different healthcare providers are collectively negligent, must explain why, under the particular circumstances, the providers owed the same standard of care to the plaintiff and breached that duty in the same manner." *Golucke v. Lopez*, 658 S.W.3d 686, 693 (Tex. App—El Paso 2022, no pet.).

2. **Was Dr. Taw required to diagnose, order images, and interpret CT scans?**

First, the dissent claims that Dr. Taw did not *obtain* images of the left carotid artery; Dr. Taw *should* have *obtained* images of the left internal carotid artery"; and "it is obvious that had Dr. Taw *obtained* images of the weakened blood vessels either surgical clipping or coiling would have been performed." However, Dr. Halbach does not state Dr. Taw was responsible for *obtaining* these images, as the dissent suggests. Dr. Halbach states that "the first physician to fall below the standard of care was the radiologist Dr. Taw who *interpreted* the CT arteriogram on 9/25/2018 performed at 1:04 A[.]M[.]" Dr. Halbach further states that images "were made of the right internal carotid artery" but "there were no images (pictures) reconstruction of the left internal carotid artery which should have been performed and would have shown the correct location of the aneurysm." We are unable to determine who did not order the imaging that Dr. Halbach claims should have been ordered. Thus, the dissent's assertions that "Had these images been obtained, they would have shown detailed pictures of the weakened blood vessel" and "the failure to obtain these images prevented recognition of a possibly treatable aneurysm" are not attributable to Dr. Taw in any expert report.

The dissent further asserts that "Dr. Taw's mistake was the failure to timely diagnose her ruptured aneurysm." Dr. Halbach does not conclude that Dr. Taw failed to timely *diagnose* a ruptured aneurysm. Instead, Dr. Halbach states that Dr. Taw "*interpreted* the CT arteriogram," and "incorrectly described the aneurysm as in the region of the anterior cerebral artery." The expert report does not allow us to determine that Dr. Taw, a radiologist, is responsible for providing a diagnosis. "Omissions may not be supplied by inference." *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002);

17

*Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 366 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances."); *Thomas v. Alford*, 230 S.W.3d 853, 589 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding the expert's report was deficient when the expert opined that the defendant's conduct "fell below the standard of care for a board[-]certified radiologist by not directly communicating these unexpected findings. This failure . . . contributed to the delay in this patient's diagnosis."). Thus, the omissions the dissent infers—that Dr. Taw failed to obtain images and failed to timely diagnose—are not stated in Dr. Halbach's report, and "we may not draw inferences to supply absent but necessary information." *Golucke*, 658 S.W.3d at 693.

The dissent states that "it is obvious that had Dr. Taw *obtained* images of the weakened blood vessels," Kristy's life would have been saved. We disagree because what is "obvious" to the dissent is an inaccurate inference—Dr. Halbach does not opine that Dr. Taw was responsible for obtaining or ordering images in a CT. In fact, not even appellees[7] invite us to infer that Dr. Taw should have ordered those images, or that he should have "properly diagnosed" the ruptured aneurysm, and we are prohibited from making these inferences because we are limited to the information within the four corners of the report. *See Jelinek*, 328 S.W.3d at 539. "A court may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended." *Boyles v. Corpus*

---

[7] Appellees ask us to identify the standard of care as follows: "[a]s a radiologist, Dr. Taw's standard of care required him to accurately read the radiographs, which he failed to do" and such failure "was identified by Dr. Halbach."

*Christi Cardiovascular & Imaging Ctr. Mgmt.*, 622 S.W.3d 420, 426 (Tex. App.—Corpus Christi–Edinburg 2020, no pet.).

### 3. Conclusory Statement

While the dissent focuses largely on the premise that Dr. Taw fell below the standard of care because he did not obtain images of the left internal carotid artery, Dr. Halbach explicitly criticizes Dr. Taw as "incorrectly describ[ing] the aneurysm as in the region of the anterior cerebral artery," and appellees rely on this one statement as the standard of care. We decline to infer a standard of care from the foregoing sentence because "res ipsa loquitur does not apply in medical-malpractice cases." *See Palacios*, 46 S.W.3d at 880.

In *Palacios*, the supreme court stated that "the statement the Palacioses rely upon—that precautions to prevent Palacios' fall were not properly used—is not a statement of a standard of care." *Id.* In *Baty*, the supreme court similarly stated that "the report's statement that the block should be administered 'in the proper manner' in order to avoid injuring the eye, by itself, is on par with the expert's conclusory opinion in *Palacios* that unspecified 'precautions to prevent [the patient's] fall were not properly utilized.'" 543 S.W.3d at 695. Likewise, here Dr. Halbach's conclusory statement that Dr. Taw incorrectly described the aneurysm as in the region of the anterior cerebral artery is not a statement of a standard of care. *See Palacios*, 46 S.W.3d at 880; *see also Baptist St. Anthony's Hosp. v. Walker*, No. 07-22-00032-CV, 2022 WL 17324338, at *4 (Tex. App.—Amarillo Nov. 29, 2022, no pet. h.) (mem. op.) (providing that information "tying the purported asphyxia event to the large subacute infarction involving the majority of his left

cerebral hemisphere" was missing because "[w]hether asphyxia, in general, or the extent allegedly encountered by the unborn child . . . can lead to such brain injury was left to inference or speculation"). Without factual explanations, Dr. Halbach's report is "nothing more than the ipse dixit of the expert," which the supreme court has held is "clearly insufficient." *Zamarripa*, 526 S.W.3d at 461. "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met" as Dr. Halbach does here. *Id.* Dr. Halbach does not state what "specific action" Dr. Taw should have done differently: did the standard of care require Dr. Taw to have described the aneurysm in both the left internal supraclinoid artery—even though we are unable to determine who should have taken the images of the left internal carotid artery—and the anterior cerebral artery, or in just the left area? *See Baty*, 543 S.W.3d at 697. We are left to speculate whether Dr. Taw identified the aneurysm as being in the right region when there was no aneurysm in the right region, whether Dr. Taw was required to identify the aneurysm in *both* regions or should Dr. Taw have determined that the aneurysm was only located in the left region. *See Palacios*, 46 S.W.3d at 880.

Dr. Halbach explicitly states, "The failure to obtain these images (pictures) prevented recognition of a *possibly* treatable aneurysm." The supreme court has made it clear that an expert report that speaks only of possibilities will not suffice to meet the causation standard. *Bowie*, 79 S.W.3d at 53 (concluding that based on the statement "if the x-rays had been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome . . ." the trial court could have reasonably determined that the report was conclusory)*; see Hutchinson*

20

*v. Montemayor*, 144 S.W.3d 614, 617 (Tex. App.—San Antonio 2004, no pet.) (concluding that the expert's claim that if arteriogram had been done, there was a "possibility" of a correctable lesion such that an amputation may have been avoided was conclusory). In *Clapp*, the expert stated that the physician's breach of "placing a nasal gastric tube prior to the emergency surgery" in turn "would have emptied the stomach (gastric gland) of its contents and prevented the aspiration that did eventually occur and led to aspiration pneumonia, prolonged intubation with ARDS, multi-organ failure and then death." *Clapp v. Perez*, 394 S.W.3d 254, 261 (Tex. App.—El Paso 2012, no pet.). The appellate court stated that this statement was "broad and sweeping in scope" and was nothing more than the expert's conclusion that the breach caused the injury." *Id.* at 261–262. The court stated:

> In essence, Dr. Herrera simply opines that one event caused another without explaining how the failure to insert a nasal-gastric tube resulted in aspiration, aspiration pneumonia, prolonged intubation with ARDS, multi-organ failure, and ultimately death. By opining that Perez died because Drs. Clapp and Gagot failed to insert a nasal-gastric tube before surgery, Dr. Herrera simply expressed his conclusion without stating the underlying facts necessary to establish that the failure to place a nasal-gastric tube was a substantial factor in causing Perez's death, and that absent this failure, Perez would not have died.

*Id.* at 262. We similarly conclude that Dr. Halbach fails to explain the basis of his statements linking his conclusion to the facts here. *See id.*

### 4. No Reference to Dr. Taw's Action

An expert "report must specifically refer to the defendant and discuss how that defendant breached the applicable standard of care." *Wood v. Tice*, 988 S.W.2d 829, 831 (Tex. App.—San Antonio 1999, pet. denied). While Dr. Cruz's expert report refers to the

21

conduct of Dr. Hart, Dr. Telke, and Dr. Dones, it fails to mention Dr. Taw and his conduct as a radiologist, or any action Dr. Taw took or failed to take regarding Kristy's care. Thus, it does not set the standard of care for Dr. Taw, does not explain how Dr. Taw deviated from the standard of care, and does not give insight as to how Dr. Taw's actions caused Kristy's injuries, and we note that appellees do not assert that Dr. Cruz adequately addressed the standard of care regarding Dr. Taw. *See Taylor*, 169 S.W.3d at 244 ("An expert report may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant specifically breached the standard and how that breach caused or contributed to the cause of injury."); *Wood*, 988 S.W.2d at 831.

Still, the dissent states: "Dr. Cruz explains that the correct location of the aneurysm was the left A1 segment." We disagree. Dr. Cruz states: [Kristy] had been diagnosed to have a subarachnoid hemorrhage secondary to ruptured aneurysm of the left A1 segment. This particular location of the aneurysm [the left A1 segment] is very easily accessible for surgical clipping and/or . . . coiling. Incredibly, none of these life[-]saving procedures were pursued." Nowhere does Dr. Cruz explain the "correct" location of the aneurysm as the dissent states. Nowhere does Dr. Cruz state that Dr. Taw was required to obtain proper images, failed to obtain the correct images, and thereafter failed to correctly identify the aneurysm. Dr. Cruz does not claim there was any error in Kristy's diagnosis. To the contrary, Dr. Cruz states that Kristy "was diagnosed to have a ruptured aneurysm in the left A1 segment," and while the left A1 location is particular easily accessible to surgery, no surgery was performed on the left A1 despite Kristy's diagnosis

22

in that location. Dr. Cruz's report does not explain that Dr. Taw diagnosed Kristy or that his diagnosis was incorrect, and Dr. Cruz does not address any "corrections" due to Dr. Taw's negligence.

Furthermore, Dr. Cruz extensively criticizes other physicians for failing to respond to Kristy's declining symptoms after 3:00 a.m., such as elevated blood pressure, headaches, gradual loss of consciousness, loss of brainstem reflexes, dilated pupils, vomiting, and other seizure activity, which was well after Dr. Taw's interpretation of the CT arteriogram at 1:04 a.m. Dr. Cruz additionally states that no neurosurgeon evaluated Kristy or the "imaging studies." "[T]he court should not have to fill in missing gaps in a report by drawing inferences or resorting to guess work." *THN Physicians Ass'n v. Tiscareno*, 495 S.W.3d 599, 607 (Tex. App.—El Paso 2016, no pet.). And in order to conclude that the expert reports adequately state the standard of care, breach of the standard of care, and that Dr. Taw's action caused Kristy's injury, we would have to fill in the missing gaps by drawing an inference that Dr. Taw's standard of care required him to order images in a CT scan and that thereafter failed to obtain the correct images, then failed to interpret the images, and finally failed to timely diagnose Kristy's "possibly treatable aneurysm." Therefore, we disagree with the dissent that Dr. Cruz's expert report implicates Dr. Taw's conduct.

**5. We cannot look beyond the four corners of the report**

The dissent reiterates that the purpose of the expert report is to inform the doctor of the conduct the plaintiff has called into question, and because Dr. Taw "plainly acknowledges in [his] brief[] the conduct appellees' question" when Dr. Taw makes his

23

argument to us, then "appellees have sufficiently apprised [Dr. Taw] of the specific conduct called into question." But Dr. Taw's statements on appeal—responding to allegations against him—have no bearing on whether the expert report satisfies the standard of care, breach, causation, and damages, and we cannot look outside the four corners of the report in assessing its sufficiency. *See Palacios*, 46 S.W.3d at 879. Resolving such a conflict based on what the dissent deems an admission (on appeal) from Dr. Taw, would require us to go beyond the four corners of the report to compare it to Dr. Taw's apparent knowledge. *See id.; Tenet Hosp. Ltd. v. Love*, 347 S.W.3d 743, 753 (Tex. App.—El Paso 2011, no pet.) ("Without a standard of care, a court cannot determine what the defendant should have done differently."); *McIntyre v. Smith*, 24 S.W.3d 911, 914–15 (Tex. App.—Texarkana 2000, pet. denied) ("The expert must explicitly state the standard of care and explain how the defendant's acts met or failed to meet that standard."); *see also Norris v. Tenet Hous. Health Sys., No.* 14-04-01029-CV, 2006 WL 1459958, at *3 (Tex. App.—Houston [14th Dist.] May 30, 2006, no pet.) (mem. op.) (providing that "a trial court does not abuse its discretion in dismissing a suit in which one is required to infer the standard of care from the allegations in the expert report").

### 6.    Thirty-Day Extension

The Legislature recognized that not all initial timely served reports would satisfy each of the statutory criteria, such as the report here. *See Ogletree*, 262 S.W.3d. at 320. For this reason, the trial court has "discretion to grant a thirty[-]day extension so that parties may, where possible, cure deficient reports." *Id.* We conclude that this case should be remanded to the trial court for consideration of whether to grant a thirty-day extension

24

of time regarding Dr. Taw. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (providing that if elements are found deficient, "the [trial] court may grant one 30-day extension"); *see also Protzman v. Gurrola*, 510 S.W.3d 640, 654–55 (Tex. App.—El Paso 2016, no pet.) ("[I]t is appropriate to remand the case to the trial court for consideration of whether the deficiencies in the expert reports can be cured, and therefore, whether to grant an extension of time."); *Taton v. Taylor*, No. 02-18-00373-CV, 2019 WL 2635568, at *9 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) ("Therefore, it is appropriate to remand the case to the trial court for consideration of whether the deficiencies in the expert report can be cured, and therefore, whether to grant an extension of time."). We sustain Dr. Taw's issue, and we remand the cause to the trial court for a consideration of whether to grant a thirty-day extension. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c).

## B. White

White specifically argues that the expert reports are deficient regarding causation because only a physician may opine on causation, and Dr. Cruz and Dr. Halbach do not assert that White or Alaniz caused Kristy's injures. Appellees contend that the expert reports, when read in conjunction, adequately address causation.

As a non-physician, Griffith may not opine on causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(c) (requiring that an expert on the causal relationship between a breach of the standard of care and injury be a physician); *see also Matagorda Nursing & Rehab. Ctr., L.L.C. v. Brooks*, No. 13-16-00266-CV, 2017 WL 127867, at *6 (Tex. App.—Corpus Christi–Edinburg Jan. 12, 2017, no pet.) (mem. op.) (concluding that

25

a registered nurse who submitted an expert report was not qualified to opine on causation). Thus, we may only glean the breach of the standard of care as it relates to White and Alaniz from Griffith's report. According to Griffith, White deviated from the standard of care by failing to recommend to a physician that a CT scan be taken after Kristy exhibited signs of a rebleed between 3:10 a.m. and 3:40 a.m.[8]

Dr. Cruz does not attribute the cause of Kristy's death to White's failure to recommend or request a CT scan "to a physician" but instead complains of the *physicians' failure to order* the scan:

> These were ominous symptoms that should have alerted any *physician* that [Kristy's] clinical condition was deteriorating. An immediate CT scan of the brain should have been done at this point. [Kristy] was not examined and it was not until 6:30 in the morning when she was not improving that Dr. Telke ordered a CT scan of the head . . . . Again, only a CT scan was ordered at 6:30 in the morning after Dr. Telke was told that [Kristy's] pupils were fixed and dilated.

(Emphasis added). Dr. Cruz only criticizes Dr. Telke's failure to order the scan. Therefore, we cannot agree with the dissent that "the physicians' reports definitively implicated Nurse White's conduct" when the Dr. Cruz criticizes only Dr. Telke's failure to order a scan rather than White's failure to suggest it to him.

Dr. Halbach's report similarly criticizes the physicians: "the ab[ru]pt ne[u]rological

---

[8] White argues that this Court should disregard Griffith's opinion that the nursing standard of care required White to recommend an emergency CT scan because doing so without a doctor's order would violate the Nurse Practice Act (NPA). *See* TEX. OCC. CODE ANN. § 301.002(2) (providing that professional nursing "does not include acts of medical diagnosis or the prescription of therapeutic or corrective measures"), *id.* § 301.004(b) (providing that the NPA does not authorize the practice of medicine). The dissent states that "appellants focus on White's status as nurse" and explains why her arguments that she is limited in her role as nurse is unpersuasive. However, we need not address these arguments as they are not dispositive to the issue of whether the expert reports are statutorily compliant, and we do not address the merits of an expert's allegations. *See* TEX. R. APP. P. 47.1.

26

decline in a patient with a recently ruptured aneurysm . . . should have resulted in a *physician* examining [Kristy] and obtaining a repeat emergent CT scan of her brain to look for rebleeding. This was not done and is far below the standard of care." Dr. Halbach's report omits any reference that a nurse should have recommended to a physician that Kristy should get a CT scan. Yet, according to the dissent, Dr. Halbach implicates White when he makes the following statement: "[t]he finding of fixed and dilated pupils should have prompted an emergency CT scan of the brain." We disagree that this statement implicates White.

Dr. Halbach explains that Dr. Telke was responsible for ordering a CT scan:

> There is no documentation that [Kristy] was examined by any physician after this abrupt neurological decline, but Dr. Telke gave an order for her to have additional antiseizure medication and not order a STAT (urgent) head CT which would have confirmed a rebleed. He did not examine [Kristy], but when told that her pupils were fixed and dilated [instead] gave orders to obtain a head CT at 6:30 A[.]M[.] if her condition had not improved. The finding of fixed and dilated pupils should have prompted an emergency CT scan of the brain and emergent involvement of a neurosurgeon.

Dr. Halbach does not fault White's failure to recommend a CT scan to Dr. Telke. Dr. Halbach consistently blames Dr. Telke for failing to order a scan, thereafter, ordering it at 6:30 a.m., and failing to summon a neurosurgeon. *See Univ. of Tex. Med. Branch at Galveston v. Qi*, 370 S.W.3d 406, 413 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (stating that the expert report, which addressed the actions of a doctor and a nurse, needed to either describe the respective standards of care for the doctor and the nurse or state that the same standard of care applied to both the doctor and the nurse).

Dr. Halbach further states:

The primary reason for [Kristy] to be admitted to the intensive care was to

27

look for any decline or change in her neurological status, which abruptly declined at 3:10 A[.]M[.] was well documented by her nurse [Nurse White] who informed Dr. Telke and nothing was done to consider the most likely cause, a rebleed from the recently ruptured aneurysm. To order a brain scan several hour[s] later prevented any chance of her making a useful recovery.

Dr. Halbach attributed Kristy's death to Dr. Telke when he stated that, "[t]o order a scan several hours later prevented any chance of [Kristy] making a useful recovery." Dr. Halbach does not opine on White's alleged failure to recommend which course of action Dr. Telke should take, and we cannot agree with the dissent that Dr. Halbach criticizes White for failing to recommend to Dr. Telke that a CT scan should be done. And neither Dr. Cruz nor Dr. Halbach assert that the cause of Kristy's death was due, in part, to White's failure to recommend a CT scan.

**C.      Alaniz**

Griffith states that the standard of care required Alaniz to "execute [the CT] order at [the] specified time given by [a] physician." But neither Dr. Cruz nor Dr. Halbach attributed the delay in completing the CT scan at 8:00 a.m. rather than 6:30 a.m. as the cause of Kristy's death. In fact, the experts do not even mention the delay.

Next, Griffith states:

Failure to maintain a[n] euvolemic fluid status by [Alaniz] in order to avoid secondary neurological inquiry to patient, as requested by Dr. Telke on 9/25/2018. It is documented that the patient produced 5975 milliliters of urine from 7:00 a[.]m[.] to 7:00 p[.]m[.] on 9/25/2018, with an intake of 1005 milliliters from 7:00 a[.]m[.] to 7:00 p[.]m[.] on 9/25/2018 . . . This indicates that the patient lost almost 5 liters of fluid . . . It is not noted in the medical record that [a] physician was notified of unequal fluid balance.

We note that Griffith illustrates there was an imbalance of fluids between 7:00 a.m. and 7:00 p.m., such that Kristy "lost almost 5 liters of fluid" within this time, but it is undisputed

28

that Kristy died at 5:01 p.m.—at least two hours before Griffith's final calculation of a five-liter fluid imbalance.

According to the dissent, "per Dr. Cruz, Kristy died from a herniation that resulted from improper management of increased pressure in the brain, pressure that resulted from an imbalance in fluids that Nurse Alaniz was responsible for balancing." However, neither Dr. Halbach nor Dr. Cruz opined that Alaniz's failure to maintain Kristy's fluids was a substantial factor in bringing about Kristy's death and that absent this factor, the harm would not have occurred. *See Zamarripa*, 526 S.W.3d. at 461.

The dissent states that Dr. Cruz "discussed in-depth the importance of maintaining a certain balance of fluids when dealing with an injury such as Kristy's." We disagree that Dr. Cruz discussed the importance of balancing fluids "in-depth." To the extent that Dr. Cruz includes a phrase that "increased intracranial pressure requires balancing the in-and-out flow of fluid component," Dr. Cruz does not attribute Kristy's death to any unequal fluid balance. "For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—i.e., but for the act or omission—the harm would not have occurred." *Id.* at 460 (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam). Dr. Cruz states that Kristy developed "increased intracranial pressure which should have been monitored and treated aggressively," and this "monitoring" is done with an implantable microtransducer or an intracranial transducer:

> The early diagnosis and characterization of increased intracranial pressure [ICP] is of prime importance in the management of [Kristy]. However, again, there was deviation from the standard of care by not providing ICP monitoring. ICP monitoring can be accomplished either invasively or by

29

noninvasive approaches. No implantable microtransducer to control the increased ICP was performed. Intracranial transducers are used widely in the neurological and neurosurgical field . . . This was not accomplished. The reason I am insisting on controlling increased intracranial pressure is because, if not, the result is brain herniation and secondary death . . . Most likely, Kristy died of uncal and/or subfalcine brain herniation, which itself causes compression . . . No neurological or neurosurgical notes indicate that this complication was being entertained or that the proper procedures would be taken care of in order to monitor and manage the increased intracranial pressure.

Dr. Cruz explains that no transducer was sought here, and therefore, the mechanism to monitor ICP was not in place. What Dr. Cruz does not do, however, is state that Kristy's fluids were imbalanced, that absent this alleged imbalance (even after her death), Kristy would not have developed increased cranial pressure, and ultimately died. *See id.*

"A plaintiff asserting a health care liability claim based on negligence, who cannot prove that her injury was proximately caused by the defendant's failure to meet applicable standards of care, does not have a meritorious claim." *Id.* at 460; *Jelinek*, 328 S.W.3d at 539–40 (providing that the expert must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented")

The dissent further states that Dr. Halbach "explained that 'the buildup of fluid around the brain can increase the pressure inside of the skull and produce acute neurological change and death if untreated,'" but an expert report that speaks only of possibilities will not suffice. *See Bowie*, 79 S.W.3d at 53. Dr. Halbach does not "explain" that here Kristy's loss of five liters of fluid caused her to build up fluid around her brain, which in turn lead to her death. Causation cannot be inferred but must be clearly stated. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.—El Paso 2008, no pet.). Thus, a link

30

in the chain of causation is missing. *See id.*

Lastly, the dissent states that Alaniz "clearly and succinctly lay[s] out the conduct implicated, so "appellees have sufficiently apprised them of the specific conduct called into question." First, it is the expert report—not appellees—that must inform the defendant of the specific conduct the plaintiff has called into question. *See Palacios*, 46 S.W.3d at 879. Second, it is the expert report—not Alaniz—that must set out the conduct implicated. Therefore, it is irrelevant that Alaniz "clearly and succinctly" states in his brief what conduct he believes was implicated; it only matters what conduct the report implicates. *See id.*

We conclude these expert reports are insufficient regarding causation in relation to Alaniz's failure to maintain euvolemic fluid. Accordingly, we find that the trial court abused its discretion when it denied Alaniz's and White's motions to dismiss, we sustain their sole issue, and we remand the cause to the trial court for a consideration of whether to grant a thirty-day extension. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c).

**D. VBM**

VBM argues that because the expert reports are insufficient as to Alaniz and White, appellees' vicarious liability claim against it must fail. *See Univ. of Tex. Med. Branch*, 259 S.W.3d at 864. Because we concluded that these reports are insufficient as to White and Alaniz, they are insufficient to support a vicarious liability claim against VBM. *See id.* We sustain VBM's issue, and we remand the cause to the trial court for a consideration of whether to grant a thirty-day extension. *See* TEX. CIV. PRAC. & REM. CODE ANN.

31

§ 74.351(c).[9]

## V.   CONCLUSION

As to Aguilera, SGT, and Dr. Huddleston, we reverse the trial court's order denying their motions to dismiss, and we remand the cause to the trial court with instructions to dismiss appellees' claims against them with prejudice and to determine reasonable attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b) (providing that if an expert report has not been served, the court shall award reasonable attorney's fees and costs incurred by the health care provider). We reverse the trial court's order denying VMB's, White's and Alaniz's, and Dr. Taw's motions to dismiss, and we remand the case to the trial court to consider whether a thirty-day extension should be granted. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (allowing one thirty-day extension to cure deficiencies in an expert report).

JAIME TIJERINA
Justice

Concurring and Dissenting Memorandum Opinion
by Justice Benavides.

Delivered and filed on the
30th day of March, 2023.

---

[9] Alaniz and White are the only two nurses identified as employees of VBM.